JACOB E. DECKER & SONS, INCORPORATED, V.
MRS. PEARL CAPPS ET AL.

No. 7815. Decided July 22, 1942.
Rehearing overruled October 7, 1942.
(164 S. W., 2d Series, 828.)

*John P. Doyle*, of Chicago, Ill., *Richard L. Arnold, William H. Arnold* and *William H. Arnold, Jr.*, all of Texarkana, Arkansas-Texas, for plaintiff in error.

A manufacturer in no wise negligent is not liable in Texas to the wife and children of a purchaser of a food product from a retailer to whom the manufacturer had previously sold the

product, because any implied warranty as between the manufacturer and the retail dealer did not run with or inure to the benefit of such wife and children. Dunn v. Texas Coca Cola Bottling Co., 84 S. W. (2d) 545; Walker v. Great A. & P. Tea Co., 131 Texas 57, 112 S. W. (2d) 170; 2 Williston on Contracts 1879; Coca Cola Bottling Co. v. Smith, 97 S. W. (2d) 761.

*Perry R. Meredith,* of Longview, *Florence & Florence, Russell Surles* and *E. M. Dodson,* all of Gilmer, for defendants in error.

Since the defendant manufactured the product known as Cervalet or summer sausage, and placed the same on the market, wrapped and sealed in cellophane packages, and sold same to a retailer, knowing that it would ultimately be sold for food to a consumer, the defendant impliedly warranted to the purchaser and the members of his family that said product was a pure and wholesome food, and upon a breach of said warranty the defendant became liable to such parties for damages. Brown Cracker & Candy Co. v. Jensen, 32 S. W. (2d) 227; Blackwell v. General Motors Co. 54 S. W. (2d) 251; Houston & T. C. Ry. Co. v. Rider, 62 Texas 267.

Mr. Chief Justice Alexander delivered the opinion of the Court.

This suit involves the question of the liability of a manufacturer of food products to the consumer thereof for damages for personal injuries sustained by him as the result of the unwholesomeness of such food.

Jacob E. Decker & Sons, Inc., manufactured and sold certain sausage, advertised as being suitable for human consumption in the summer time, under the trade name of "Cervalet," which sausage was wrapped in a cellophane package. The sausage in question was sold on March 16, 1939, by Jacob E. Decker & Sons, Inc., to a retail merchant in Texas for resale, and was purchased by C. K. Capps on March 19, 1939. It was consumed immediately by members of Capps' family, and as a result one of the children died and other members of the family were made seriously ill. Mrs. Capps, after the death of her husband from other causes, brought suit for herself for damages for the injuries sustained by her as a result of the eating of the contaminated sausage. She also brought two other suits as next friend for her two surviving minor children for damages for the injuries suffered by them. The three suits

were tried together. The jury found that at the time the sausage in question was processed and manufactured it was contaminated and poisonous to such an extent as to be unfit for human consumption; and that the eating thereof by the members of Capps' family proximately resulted in their serious illness. The jury further found, however, that Decker & Sons did not fail to properly inspect the sausage, and that the contaminated and poisonous condition of the sausage at the time it was manufactured was not due to the negligence of Decker & Sons in the manufacture and processing thereof, and that the illness suffered by Capps' family from the eating of the sausage was the result of an unavoidable accident. Judgment in favor of the plaintiffs for damages sustained by them were affirmed by the Court of Civil Appeals. 144 S. W. (2d) 404.

The jury's verdict, as we understand it, amounts to a finding that the sausage, at the time it was processed and manufactured by Decker & Sons, was so contaminated and poisonous as to be unfit for human consumption and the members of Capps' family were seriously injured by the eating thereof; but Decker & Sons was not negligent in the manufacture of the sausage. The finding of the jury that the injuries suffered by plaintiffs were the result of an unavoidable accident amounted to nothing more than a finding that there was no negligence on the part of either the plaintiff or the defendant.

Under the foregoing facts, the question to be determined is whether a nonnegligent manufacturer, who processes and sells contaminated food to a retailer for resale for human consumption, is liable to the consumer for the injuries sustained by him as a result of the eating of such food. So far as we have been able to ascertain, this exact question has not heretofore been before this Court. While there is quite a contrariety of opinion on the subject in other jurisdictions, there is no dearth of authorities. The question has been the subject of many annotations in the American Law Reports, as well as numerous articles in law reviews. 17 A. L. R. 709; 39 A. L. R. 1000; 63 A. L. R. 349; 88 A. L. R. 534; 105 A. L. R. 1511; 111 A. L. R. 1251; Jeanblanc, "Manufacturer's Liability to Persons Other Than Their Immediate Vendees," 24 Va. L. Rev. 134-158; Lessler, "Implied Warranty of Quality in Sales of Food," 14 Conn. B. J. 45-63; Perkins, "Unwholesome Food as a Source of Liability," 5 Iowa L. B. 6-35, 86-111; Note, 12 Neb. L. B. 163-175; Note, 21 Minn. L. Rev. 315-325.

■ After having considered the matter most carefully, we have reached the conclusion that the manufacturer is liable for the injuries sustained by the consumers of the products in question. We think the manufacturer is liable in such a case under an implied warranty imposed by operation of law as a matter of public policy. We recognize that the authorities are by no means uniform, but we believe the better reasoning supports the rule which holds the manufacturer liable. Liability in such case is not based on negligence, nor on a breach of the usual implied contractual warranty, but on the broad principle of the public policy to protect human health and life. It is a well-known fact that articles of food are manufactured and placed in the channels of commerce, with the intention that they shall pass from hand to hand until they are finally used by some remote consumer. It is usually impracticable, if not impossible, for the ultimate consumer to analyze the food and ascertain whether or not it is suitable for human consumption. Since it has been packed and placed on the market as a food for human consumption, and marked as such, the purchaser usually eats it or causes it to be served to his family without the precaution of having it analyzed by a technician to ascertain whether or not it is suitable for human consumption. In fact, in most instances the only satisfactory examination that could be made would be only at the time and place of the processing of the food. It seems to be the rule that where food products sold for human consumption are unfit for that purpose, there is such an utter failure of the purpose for which the food is sold, and the consequences of eating unsound food are so disastrous to human health and life, that the law imposes a warranty of purity in favor of the ultimate consumer as a matter of public policy.

Since very early times the common law has applied more stringent rules to sales of food than to sales of other merchandise. It has long been a well-established rule that in sales of food for domestic use there is an implied warranty that it is wholesome and fit for human consumption. Race v. Krum, 222 N. Y. 410, 118 N. E. 853, L. R. A. 1918F 1172; Wiedeman v. Keller, 171 Ill. 93, 49 N. E. 210; Houston Cotton Oil Co. v. Trammel (Texas Civ. App.), 72 S. W. 244; 55 C. J. 764; 24 R. C. L. 195; 37 Tex. Jur. 299. A majority of the American courts that have followed this holding have not based such warranty upon an implied term in the contract between buyer and seller, nor upon any reliance by the buyer on the representation of the seller, but have imposed it as a matter of public

policy in order to discourage the sale of unwholesome food. The Supreme Court of Michigan has stated the reason for the rule in Hoover v. Peters (1869), 18 Mich. 51, as follows:

"And where articles of food are bought for consumption, and the vendor sells them for that express purpose, the consequences of unsoundness are so dangerous to health and life, and the failure of consideration is so complete, that we think the rule which has often been recognized, that such sales are warranted, is not only reasonable, but essential to public safety. There may be sellers who are not much skilled, and there may be purchasers able to judge for themselves, but in sales of provisions the seller is generally so much better able than the buyer to judge of quality and condition, that if a general rule is to be adopted, it is safer to hold the vendor to a strict accountability than to throw the risk on the purchaser. The reason given by the New York authorities, in favor of health and personal safety, is much more satisfactory than the purely commercial considerations which take no account of these important interests. While the question has not perhaps been very often decided, the principle has been generally accepted among the legal writers, and we feel no disposition to recede from it."

In Wiedeman v. Keller (1897), 171 Ill. 93, 49 N. E. 210, the Supreme Court of Illinois adopted the same view and pointed out the distinction between sales of food and other sales, saying:

"In an ordinary sale of goods, the rule of caveat emptor applies, unless the purchaser exacts of the vendor a warranty. Where, however, articles of food are purchased from a retail dealer for immediate consumption, the consequences resulting from the purchase of an unsound article may be so serious, and may prove so disastrous to the health and life of the consumer, that public safety demands that there should be an implied warranty on the part of the vendor that the article sold is sound, and fit for the use for which it was purchased."

In 1918 the New York Court of Appeals in Race v. Krum, supra, reaffirmed the principle in the following language:

"This rule is based upon the high regard which the law has for human life. The consequences to the consumer resulting from consumption of articles of food sold for immediate use

may be so disastrous that an obligation is placed upon the seller to see to it, at his peril, that the articles sold are fit for the purpose for which they are intended. The rule is an onerous one, but public policy, as well as the public health, demand such obligation should be imposed."

In Catani v. Swift & Company, 251 Pa. 52, 95 A. 931, L. R. A. 1917B, pp. 1272, 1273, it was said:

"The general rule is that, where the sale of articles of food is for immediate consumption, there is an implied warranty that the food is wholesome and fit for the purpose intended, irrespective of the seller's knowledge of disease or defects therein."

In Parks v. C. C. Yost Pie Co., 93 Kan. 334, 144 P. 202, L. R. A. 1915C, pp. 179, 181, it was said:

"A manufacturer or dealer who puts human food upon the market for sale or for immediate consumption does so upon an implied representation that it is wholesome for human consumption. Practically he must know it is fit or take the consequences, if it proves destructive."

See, also, 22 Amer. Jur. 880.

The rule which imposes a warranty, as a matter of public policy, of the soundness of food sold for human consumption is not of modern origin. As far back as the year 1266 A. D. the statute of Pillory and Tumbrel and of the assize of bread and ale (51 Hen. III, stat. 6) provided in part: "It is ordained that none shall sell corrupt victuals." A note in Keilway's Rep. 91 (22 Hen. 7), 72 Eng. Reprint 254, states that "no man can justify selling corrupt victual, but an action on the case lies against the seller, *whether the victual was warranted to be good or not*. But if a man sells me clothes or other thing, knowing the cloth to be bad, there I am deceived; and in that case, because he did it knowingly, though he sold it without warranty, still he shall be punished by writ on the case. But if he did not know it, he shall not be punished, unless he warranted the article to be good." (Italics ours.) It will be noted that a clear distinction is drawn between sales of food and sales of cloth, or other articles of merchandise. In the latter case, knowledge is necessary, unless there is an express warranty, but not so in the former. Moreover, the expression "no man

can justify selling corrupt victual" indicates that the duty was absolute, and its breach could not be justified by lack of knowledge or by any degree of care. Likewise, in Roswel v. Vaughan (1607), Cro. Jac. 196, 97 Eng. Reprint 196, the court said: "But if a man sell victuals which is corrput, without warranty, an action lies, because it is against the commonwealth." According to Lord Coke, the selling of corrput victuals was a common nuisance. 4 Inst. 261. Baron Parke of the Court of Exchequer in Burnby v. Bollett (1847), 16 M. & W. 646, 153 Eng. Reprint 1348, in discussing this principle of law said:

"There is no other difference between the sale of victuals for food and other articles, than this, that victuallers, butchers, and other common dealers in victuals, are not merely in the same situation that common dealers in other commodities are, and liable under the same circumstances that they are, so that, if an order be sent to them to be executed, they are presumed to undertake to supply a good and merchantable article; but they are also liable to punishment for selling corrupt victuals, by virtue of an ancient statute (certainly if they do so knowingly, and probably if they do not), and are therefore responsible civilly to those customers to whom they sell such victuals, for any special or particular injury by the breach of the law which they thereby commit."

This tendency of the early common law to impose an extraordinary liability in sales of food has not been recognized by the later English decisions. Emmerton v. Mathews (1862), 7 H. & N. 587, 158 Eng. Reprint 604; Bigge v. Parkinson (1862), 7 H. & N. 955, 158 Eng. Reprint 758; Smith v. Baker (1878), 40 L. T. (N. S.) 201. Nor was it codified in the English Sale of Goods Act of 1893. See Perkins, "Unwholesome Food as a Source of Liability," 5 Iowa Law Bulletin, pp. 6-12. However, prior to that time it had been brought to this country and adopted as a part of the common law of England.

In 1815, in the case of Van Bracklin v. Fonda, 12 Johns. (N. Y.) 468, 7 Am. Dec. 339, the New York court said:

"In 3 Black. Com. 165 it is stated as a sound and elementary proposition that in contract for provisions, it is always implied that they are wholesome; and if they are not, case lies to recover damages for the deceit.

"In the sale of provisions for domestic use, the vendor is *bound to know that they are sound and wholesome at his peril.*

This is a principle, not only salutary, but necessary to the preservation of health and life." (Italics ours.)

The rule above announced has been adhered to by subsequent decisions of other courts in this country and has been recognized as a distinct implied warranty peculiar to sales of food, although the obligation existed long before implied warranties were recognized. This implied warranty was not based on any reliance by the buyer upon the representations of the seller, or upon his skill and judgment, but was grounded squarely upon the public policy of protecting the public health. Van Bracklin v. Fonda, (N. Y.) 12 Johns. 468, 7 Am. Dec. 339; Wright v. Hart (N. Y.), 18 Wend. 449; Moses v. Mead (N. Y.), 1 Denio 378, 43 Am. Dec. 676; Divine v. McCormick (N. Y.), 50 Barb. 116; Burch v. Spencer (N. Y.), 15 Hun. 504; Fairbanks Canning Co. v. Metzger, 118 N. Y. 581, 260, 23 N. E. 372, 16 Am. St. Rep. 753; 26 A. L. R. 148; Race v. Krum, 222 N. Y. 410, 581, 118 N. E. 853; L. R. A. 1918F 1172; Rinaldi v. Mohican Co., 225 N. Y. 70, 121 N. E. 471; Wiedeman v. Keller, 171 Ill. 93, 49 N. E. 210; Cushing v. Rodman, 82 Fed. (2d) 864; Getty v. Rountree, 2 Chandler (Wis.), 28, 54 Am. Dec. 138; Hoover v. Peters, 18 Mich. 51; Lukens v. Freiund, 27 Kan. 664, 41 Am. Rep. 429.

The implied warranty of wholesomeness has been recognized and applied in Texas by the Courts of Civil Appeals. Coca-Cola Bottling Co. v. Smith, 97 S. W. (2d) 761; S. H. Kress & Co. v. Ferguson, 60 S. W. (2d) 817; Houston Cotton Oil Co. v. Trammell, 72 S. W. 244. See, also, 55 C. J. 764, 24 R. C. L. 195, 37 Tex. Jur. 195. A similar holding was made by the Court of Civil Appeals in the instant case. 144 S. W. (2d) 404.

■ While a right of action in such a case is said to spring from a "warranty," it should be noted that the warranty here referred to is not the more modern contractual warranty, but is an obligation imposed by law to protect public health. According to Prof. Williston the law of warranty is older by a century than the action of special assumpsit, from which the modern law of contracts developed. I Williston on Sales, p. 368, Sec. 195; Jeanblanc, "Manufacturer's Liability to Persons Other Than Their Immediate Vendees," 24 Va. L. Rev. 134, 158, at p. 148. The action on a warranty sounded in tort was in the nature of an action on the case for deceit, although it was

not necessary to plead or prove *scienter*. 1 Williston on Sales, p. 371. It is believed that much of the confusion among the courts on this question is due to the failure to note this difference in the use of the term "warranty." It has led many courts to believe that in order to sustain an action under such a warranty there must be privity of contract and reliance on the representation. The doctrine of privity of contract and of the necessity therefor in order to sustain an action grew out of the later action of assumpsit. It applies only when one is seeking to enforce a contract. Here the liability of the manufacturer and vendor is imposed by operation of law as a matter of public policy for the protection of the public, and is not dependent on any provision of the contract, either expressed or implied.

It must be conceded that many courts have denied recovery against the manufacturer and have insisted strictly on the requirement of privity. Birmingham Chero-Cola Bottling Co. v. Clark, 205 Ala. 678, 89 So. 64; 17 A. L. R. 667; Nelson v. Armour Packing Co., 75 Ark. 352, 90 S. W. 288; 6 Am. Cas. 237; Drury v. Armour & Co., 140 Ark. 371, 216 S. W. 40; Nehi Bottling Co. v. Thomas 236 Ky. 684, 33 S. W. (2d) 701; Roberts v. Anheuser-Busch Brewing Co., 211 Mass. 449, 98 N. E. 95; Flaccamio v. Eysink, 129 Md. 367, 100 A. 510; Pelletier v. Dupont, 124 Me. 269, 128 A. 186, 39 A. L. R. 972; Chysky v. Drake Brothers Co., 235 N. Y. 286, 139 N. E. 576, 27 A. L. R. 1533; Redmond v. Borden's Farm Products Co., 245 N. Y. 512, 157 N. E. 838; Tomlinson v. Ballard & B. Co., 208 N. C. 1, 179 S. E. 30; Crigger v. Coca-Cola Bottling Co., 132 Tenn. 545, 179 S. W. 155, L. R. A. 1916B, 877, Ann. Cas. 1917B 572, 11 N. C. C. A. 359; Hoback v. Coca-Cola Bottling Works, 20 Tenn. App. 280, 98 S. W. (2d) 113; Buckley v. Mott (Novo Scotia), 50 D. L. R. 408.

There is a growing tendency, however, to discard the requirement of privity and to hold the manufacturer liable directly to the ultimate consumer. Davis v. Van Camp Packing Co., 189 Iowa 775, 176 N. W. 382, 17 A. L. R. 649; Parks v. C. C. Yost Pie Co., 93 Kan. 334, L. R. A. 1915C 179, 144 Pac. 202, 7 N. C. C. A. 100; Rainwater v. Hattiesburg Coca-Cola Bottling Co., 131 Miss. 315, 95 So. 444; Cheuault v. Houston Coca-Cola Bottling Co., 151 Miss. 366, 118 So. 177; Coca-Cola Bottling Works v. Simpson, 158 Miss. 390, 130 So. 479, 72 A. L. R. 143; Curtiss Candy Co. v. Johnson, 163 Miss. 426, 141 So. 762; Cudahy Packing Co. v. Baskin, 170 Miss. 834,

155 So. 217; Armour & Co. v. McMillan, 171 Miss. 199, 155 So. 218; Madouras v. Kansas City Coca-Cola Bottling Co., 230 Mo. App. 275, 90 S. W. (2d) 445; Nemela v. Coca-Cola Bottling Co. (Mo. App.), 104 S. W. (2d) 773; Ward Baking Co. v. Trizzino, 27 Ohio App. 475, 161 N. E. 557; Catani v. Swift & Co., 251 Pa. 52, L. R. A. 1917B, 1272, 95 Atl. 931, error dismissed in 241 U. S. 690, 36 S. Ct. 554, 60 L. Ed. 1238; Nock v. Coca-Cola Bottling Co., 102 Pa. Super. Ct. 515, 156 Atl. 537. See 55 C. J. 669, 22 Am. Jur. 891-893.

It is also true that there are many cases in which liability has been sustained on the ground of contractual warranty. Where there is privity of contract and there is a breach of warranty, either expressed or implied, liability can be sustained thereon, as in the case of the sale of commodities other than food. Nemela v. Coca-Cola Bottling Co. (Mo. App.), 104 S. W. (2d) 773. The fact, however, that the liability may be sustained in some cases because of a breach of a contractual warranty does not argue against the sustaining of liability on the ground herein adhered to—warranty imposed by law as a matter of public policy. The two remedies may coexist, and liability may be sustained under either one of them that is available.

Many of the courts which have allowed a recovery where there was no direct contractual relationship between plaintiff and defendant have done so by indulging in fictions, such as presumed negligence, fraud, assignment of cause of action from dealer to consumer, third party beneficiary contract, and agency of the buyer for the consumer. Jeanblanc, "Manufacturer's Liability to Persons Other Than Their Immediate Vendees," 24 Va. L. Rev. 134-158. Such authorities but evidence the efforts made by the courts to place absolute liability on the manufacturer and vendor of food products to the consumer for damages caused by impurities therein. Such fictions are indulged merely because it is thought necessary to do so in order to get away from the rule which requires privity of contract where recovery is sought on an implied warranty growing out of a contract. We believe the better and sounder rule places liability solidly on the ground of a warranty not in contract, but imposed by law as a matter of public policy.

Some courts have imposed upon the manufacturer and vendor an implied warranty which is said to "run with the article." Coca-Cola Bottling Co. of Fort Worth v. Smith, 97 S. W. (2d) 761. While this appears to be based on sound logic,

it is more a reason for the imposition of warranty by operation of law than it is an independent ground of liability in itself. There certainly is justification for indulging a presumption of a warranty that runs with the article in the sale of food products. A party who processes a product and gives it the appearance of being suitable for human consumption, and places it in the channels of commerce, expects some one to consume the food in reliance on its appearance that it is suitable for human consumption. He expects the appearance of suitableness to continue with the product until some one is induced to consume it as food. But a modern manufacture or vendor does even more than this under modern practices. He not only processes the food and dresses it up so as to make it appear appetizing, but he uses the newspapers, magazines, billboards, and the radio to build up the psychology to buy and consume his products. The invitation extended by him is not only to the house wife to buy and serve his product, but to the members of the family and guest to eat it. In fact, the manufacturer's interest in the product is not terminated when he has sold it to the wholesaler. He must get it off the wholesaler's shelves before the wholesaler will buy a new supply. The same is not only true of the retailer, but of the house wife, for the house wife will not buy more until the family has consumed that which she has in her pantry. Thus the manufacturer or other vendor intends that this appearance of suitability of the article for human consumption should continue and be effective until some one is induced thereby to consume the goods. It would be but to acknowledge a weakness in the law to say that he could thus create a demand for his products by inducing a belief that they are suitable for human consumption, when, as a matter of fact, they are not, and reap the benefits of the public confidence thus created, and then avoid liability for the injuries caused thereby merely because there was no privity of contract between him and the one whom he induced to consume the food. The mere fact that a manufacturer or other vendor may thus induce the public to consume unwholesome food evidences the soundness of the rule which imposes a warranty, as a matter of public policy, on the sale of food or other products intended for human consumption. Of course, ordinarily, in the absence of a representation or contract to the contrary, a manufacturer or vendor should not be held liable for defects caused by contamination or deterioration which occur after the commodity has left his hands. In this case, however, the jury found that the food was contaminated at the time it was processed.

The policy of the law to protect the health and life of the public would only be half served if it were to make liability depend on the ordinary contractual warranty. Privity of contract and reliance on the skill and judgment of the manufacturer or other vendor would be necessary to a recovery in such a case. Under this rule, although a guest should go with the host and aid in selecting the food, the host alone could recover for the injuries caused by the eating thereof, because there would be no contractual relation between the guest and the manufacturer or other vendor. The same would be true with reference to the rule which requires proof of reliance on the skill and judgment of the manufacturer or vendor. Only those who could swear that they relied on the skill and judgment of the manufacturer as to the purity of the food before eating it could recover, when, as a matter of fact, the very eating of the food evidences a reliance on its appearance as being suitable for human consumption. If the main purpose of the rule is to protect the health and life of the public, there is no merit in denying relief to a consumer against the manufacturer on the ground of lack of direct contractual relation. If a man buys food and his whole family and guest eat it and all become ill, it would be arbitrary and unreasonable to say that only the man who bought the food would have a remedy for his sufferings. As said in Ketterer v. Armour & Co., 200 Fed. 322: "The remedies of injured consumers ought not to be made to depend upon the intricacies of the law of sales. The obligation of the manufacturer should not be based alone upon privity of contract. It should rest, as was once said, upon 'the demands of social justice."

■ It will also be noted that in many cases liability is placed on negligence in the processing of the food, and this has led some courts to conclude that proof of negligence was essential to a recovery. But it must be borne in mind that liability could be based on negligence, independent of the rule which imposes a warranty as a matter of public policy, and therefore those authorities which allow a recovery on proof of negligence are not authority for holding that a recovery cannot be had under the doctrine of a warranty imposed by an operation of law, even though there be no negligence. Since the warranty of suitableness is imposed by law as a matter of public policy, there is no need for proof of negligence. In the case of Coca-Cola Bottling Works v. Simpson, 158 Miss. 390, 130 So. 479, 72 A. L. R. 143, it is said:

"Appellant introduced the witness Curtis for the purpose of proving that its machinery and methods, by means of which it bottled the Coca Cola, were modern and of the best, and not obsolete. On appellee's objection this evidence was excluded; and appellant argues that this action of the court was error. If error, it was without any harm whatever, because appellant, by its evidence, absolutely demonstrated that its machinery and methods rendered it all but impossible for any foreign substance to get into the bottles during the process of manufacture. But the evidence failed to show that it was impossible. Negligence is not the basis of this action. Appellant is liable to appellee if the foreign substance got into the bottle of Coca Cola in question during the process of manufacture, regardless of the efficiency of appellant's machinery and methods used in its plant. As stated above in this opinion, the basis of this suit is breach of an implied warranty, and not negligence on the part of appellant."

In fact, a rule which would require proof of negligence as a basis of recovery would, in most instances, by reason of the difficulty of making such proof, be equivalent to a denial of recovery. It is well known that in many instances the product is processed in a distant state or in a foreign country many months prior to a discovery of the defect. It would be impracticable, if not impossible, for the consumer to prove the circumstances under which a particular can of beans or meat eaten by him has been processed. This can be very well illustrated by the facts involved in the case of Burkhardt v. Armour & Co., 115 Conn. 242, 161 Atl. 385, 90 A. L. R. 1260. In that case a resident of Connecticut purchased a can of meat from a local merchant. The merchant had purchased it from Armour & Company, of Illinois, who in turn had purchased it from Frigorifico Armour de la Plata, of Argentina. The latter company had purchased it from a packer in Argentina. It would have been impracticable, if not impossible, for the consumer to have proved the conditions under which the food had been packed in Argentina many months prior to the date of the injury suffered by the consumer. All this furnishes proof of the soundness of the rule herein quoted from Van Bracklin v. Fonda, supra, wherein it was held that in the sale of food for human consumption "the vendor is bound to know that they are sound and wholesome at his peril." Such a rule would seem to be more desirable because it permits the placing of the ultimate loss upon the manufacturer, who is in the best position

to prevent the production and sale of unwholesome food. It stimulates and induces a greater degree of precaution for the protection of human health and life than does the rule of ordinary care.

There is no doubt tbout the public policy of this State with regard to the sale of impure foods. Article 706 of the Penal Code expressly provides that no person shall manufacture or offer for sale in this State any adulterated food. Article 707 of the Penal Code, Sec. (b) 5 and 6, defines adulterated food as any food containing any added poisonous or deleterious ingredients which may render such food injurious to health, or which consists in whole or in part of a filthy, decomposed, or putrid animal or vegetable substance.

We hold that the defendant, as the manufacturer and vendor of the sausage in question, was liable to the plaintiffs, as the consumers thereof, for the injuries caused to them by the contaminated and poisonous substance in the sausage at the time the defendant manufactured and sold the same, even though the defendant was not negligent in the processing thereof.

The judgments of the Court of Civil Appeals and of the trial court in each of the three cases are affirmed.

Opinion delivered July 22, 1942.

MR. JUSTICE CRITZ concurring.

I agree to the judgment in this case. In doing so I agree to the holding expressed in the opinion of this Court by Chief Justice Alexander that the manufacturer or processor of food intended for human consumption impliedly warrants that it is free from contamination and fit for human consumption. I think this rule is universal in its application, and applies even to food put up in sealed containers, with or without the name of the manufacturer or processor indicated therein. In fact, I think we committed ourselves to the above rule in Walker v. Great Atlantic & Pacific Tea Company, 131 Texas 57, 112 S. W. (2d) 170, cited in Chief Justice Alexander's opinion in this case. I do not believe that the above rule applies to retailers of food put up in sealed containers, with the name of the manufacturer or processor indicated on such containers. My views on that question are expressed in my dissenting opinion filed in

Cause No. 7733, Griggs Canning Company et al, Appellants, v. Norman Josey et al, Appellees, opinion this day delivered by this Court.

Opinion delivered July 22, 1942.

Rehearing overruled October 7, 1942.