George WILDERSPIN, Appellant,

v.

BEWLEY MILLS, Inc., Appellee.

No. 15758.

Court of Civil Appeals of Texas.

Fort Worth.

Nov. 23, 1956.

On Rehearing Jan. 18, 1957.

Rehearing Denied Feb. 15, 1957.

Rawlings, Sayers, Scurlock & Eidson and Nelson Scurlock, Fort Worth, for appellant.

Cantey, Hanger, Johnson, Scarborough & Gooch and Emory Cantey, Fort Worth, for appellee.

BOYD, Justice.

Appellant George Wilderspin sued appellee Bewley Mills, Inc., for damages, alleging that his herd of about 400 cattle became diseased and emaciated and many of them died as a result of their consuming feed manufactured and sold by appellee to appellant. There were allegations of breach of implied warranty and negligence, but the case was submitted to the jury only upon the basis of breach of warranty.

The jury found that when the feed was delivered to appellant by appellee it contained trichloroethylene; that the eating of such feed by the cattle was the producing cause of their becoming diseased and emaciated and of many of them dying; and that the difference in the value of the cattle before and after they became affected with disease was $57,505.

At the close of the evidence, appellee moved for an instructed verdict, which motion was overruled; after the verdict, appellee moved for judgment non obstante veredicto, which motion was overruled, and judgment was entered for appellant for $67,424.65; which included interest at six per cent per annum from March 10, 1953. After hearing appellee's amended motion for new trial, one ground thereof being that the court erred in overruling appellee's motion for instructed verdict, and another being that the court erred in overruling appellee's motion for judgment non obstante veredicto, the court set aside its original judgment, and its order overruling appellee's motion for judgment non obstante veredicto, and granted said motion, decreeing that appellant take nothing.

Appellant presents a single point of error, namely, that the court erred in granting appellee's motion for judgment non obstante veredicto. He contends that since appellee sold the feed to appellant for immediate consumption by his cattle, appellee impliedly warranted that the feed was wholesome and fit for its intended use; that since the cattle were damaged by eating the feed, appellee was liable on the implied warranty; and that there was evidence of probative force upon which the jury made its findings, which evidence would have supported a judgment for appellant.

We do not doubt that when appellee sold the feed to appellant it impliedly warranted that the feed was wholesome and fit to be

fed to cattle. The feed was sold for immediate consumption. "On a sale of food or provisions for 'immediate consumption,' the seller impliedly warrants that the commodity is wholesome and fit for the intended use. The warranty applies to a sale of stock feed, as well as to a sale of food for human consumption, made by a retail dealer to a consumer, where the purpose of the latter is understood. * * *" 37 Tex.Jur., p. 299, sec. 131, and authorities there cited. On page 294, sec. 126, of the same volume, we find the following: "A manufacturer who makes and sells an article to be used for a specific purpose impliedly warrants that it is reasonably fit for the purpose, when used in the proper or prescribed manner or quantity, and under prescribed conditions." See also Houston Cotton Oil Co. v. Trammell, Tex.Civ.App., 72 S.W. 244; Parks v. O'Connor, 70 Tex. 377, 8 S.W. 104; Jones v. George, 61 Tex. 345; Needham v. Dial, 4 Tex.Civ.App. 141, 23 S.W. 240; Kellogg Bridge Co. v. Hamilton, 110 U.S. 108, 3 S.Ct. 537, 28 L.Ed. 86.

■ Judgment non obstante veredicto is never warranted unless a directed verdict would have been proper. Before such a judgment may be sustained, it must appear that there is no evidence of probative force upon which the jury could have made its findings. And in cases of this kind, a reviewing court must consider the testimony from the standpoint most favorable to the party against whom the judgment is entered. It is the jury's province to weigh the evidence and determine the credibility of the witnesses; this the trial court cannot do in considering whether a directed verdict is proper. The jurors are not only the exclusive judges of the facts proved, but of all reasonable inferences to be drawn from the facts. In considering a motion for instructed verdict or for judgment non obstante veredicto, the trial court is not at liberty to decide whether a finding of the jury is against the great weight and preponderance of the credible testimony. And where, as here, judgment non obstante veredicto is entered, the only question which a

reviewing court has power to determine is whether there was evidence of probative force to raise a jury issue, regardless of the weight of the evidence to the contrary. Burt v. Lochausen, 151 Tex. 289, 249 S.W.2d 194; Whiteman v. Harris, Tex. Civ.App., 123 S.W.2d 699, writ refused; Warren v. Schawe, Tex.Civ.App., 163 S.W.2d 415, writ refused; Lockley v. Page, 142 Tex. 594, 180 S.W.2d 616; Stephenville, N. & S. T. Ry. Co. v. Shelton, Tex.Com.App., 208 S.W. 915; 53 Am. Jur., p. 143, sec. 158.

■ We are unable to agree with appellee's contention that the evidence in support of the verdict amounts to no more than surmise or conjecture. Furthermore, we think appellee's appraisal of the testimony is more a criticism of its weight than of its legal sufficiency to raise fact issues. After a careful consideration of the evidence, we are forced to the conclusion that it had sufficient probative force to carry the case to the jury, and that therefore judgment for appellee non obstante veredicto was not warranted.

Appellee had manufactured the feed which it sold to appellant. It was about twelve per cent soybean meal. It was shown that some processors of soybeans used trichloroethylene as a solvent in extracting the oil from the bean, and that soybean meal processed in this manner is poisonous to animals consuming it, and especially to ruminants.

It is unnecessary to set out the voluminous evidence in detail. It was sufficient to show the following: Appellant's cattle were in good condition during the summer and autumn of 1952; the grass was good on his ranch; much of the ranch was bottom land where the grass was green throughout the autumn months; there was about one head of cattle to every ten acres of grazing land; but appellant wanted to supplement the nourishment obtained by the cattle from grazing, and on the recommendation of appellee's representative, he bought from appellee 720 one hundred pound sacks of Bew-

ley's Anchor Range Chunkets, which contained the soybean meal; 20 sacks were delivered to appellant at appellee's mill on August 19, 1952; 200 sacks were purchased on October 10, 1952, and shipped by appellee to appellant's ranch by train; 500 sacks were purchased on November. 13, 1952, which appellee likewise shipped by train; appellant began feeding the chunkets about November 1, 1952, at the rate of one pound per day per head, and in ten or twelve days the amount was increased to two pounds per day; in December some of the cattle appeared to be losing weight, and two died; at the suggestion of Dr. Williamson, a veterinarian, the feeding of the chunkets was increased to three or more pounds per day; the cattle continued to decline in condition, and feeding of the chunkets was discontinued about January 10, 1953; no improvement in the condition of the cattle was noted after the discontinuance of such feed, but on the contrary their condition deteriorated; by March 10, 1953, 129 cattle had died, and the others were sold, some of which were condemned as unfit for beef for human consumption; appellant used no prepared feed other than that purchased from appellee.

Dr. Williamson testified that he was called to examine the cattle a few days before Christmas, 1952; that the emaciated condition of the cattle led him to suspect that they were not getting sufficient nourishment, and he recommended increasing the amount of chunkets fed until each animal was getting three or four pounds per day; that after such increased ration did not improve the condition of the cattle, he made a test for anthrax, which was negative; that he then suspected that the cattle had hyperkeratosis and called Dr. Schmidt, a veterinarian with Texas Agricultural & Mechanical College; that Dr. Schmidt determined that the cattle were not afflicted with hyperkeratosis; that witness then concluded that the condition of the cattle resulted from plant or chemical poisoning; that the only plant the eating of which would give rise to symptoms resembling those exhibited by the

cattle was bracken fern; that he went over the ranch and found no bracken fern; that bracken fern was not commonly found at the time of year in question; that a veterinarian from the Texas Livestock Sanitary Commission determined that the cattle were not afflicted with any infectious disease; and that witness finally concluded that their condition resulted from chemical poisoning from their feed.

Appellant sent a sample of the chunkets to the McCarroll Laboratories in Oklahoma City for chemical analysis. McCarroll, the owner of the laboratory, testified that he had a bachelor of science degree, majoring in agricultural chemistry, and that he had had many years' experience as a chemist; and that he made a chemical analysis of the chunkets and that it showed the presence of trichloroethylene.

Dr. Williamson further testified that trichloroethylene poisoning was practically unknown in Texas at the time he first examined appellant's cattle, and he was not then familiar with the effect that chemical would have on cattle consuming it; but since trichloroethylene was found in the chunkets, he had made a study of its effect on cattle from available literature and the investigations of reputable scientists, and it was now his opinion that the deterioration of appellant's cattle was caused by their consumption of that chemical.

Dr. Nye, another veterinarian, testified that he saw the herd and saw an autopsy performed on the carcass of one cow shortly after it was killed; that from the history he obtained from appellant and his ranch foreman, it was his opinion that the cattle had been adequately fed; that there was no evidence of parasitism or infectious disease; that even if trichloroethylene had not been found in the feed, "we would be. justified in making a tentative diagnosis of trichloroethylene treated meal poison." In answer to a hypothetical question based upon testimony of appellant, his foreman, and Dr. Williamson, Dr. Nye testified: "* * * that is an ex-

cellent description of the expected pathology in trichloroethylene-extracted soybean meal. * * * the autopsy picture that you described is pathognomonic, to use a word—in other words, it doesn't appear in any other condition, the specific point you have covered. * * * The finding of any trace of trichloroethylene would be conclusive. * * *"

Appellee insists that it was conclusively shown that there was no trichloroethylene in the feed at the time it was delivered to appellant, and therefore the circumstantial case made by appellant was insufficient to raise issues of fact. In support of this position, appellee contends that it was established that no processor of soybean meal whose product went into the manufacture of the chunkets sold to appellant ever used the trichloroethylene-solvent process. There was evidence that from August 12, 1952, to November 10, 1952, appellee bought soybean meal for use in the manufacture of its chunkets which had been processed by only four concerns, and witnesses testified that three of those processors did not use trichloroethylene as a solvent, and the "Blue Book" published by the American Soy Bean Association listed the other processor as one who used the expeller extraction method. We think the most that can be said for this evidence is that it tendered an issue of fact.

Moreover, appellee's buyer Cox testified that it was common practice among the feed manufacturers in Fort Worth, including appellee, "to help out one another when they get in a tight spot, or maybe cars that have been delayed in transit and people borrow a car from one of the other companies here in town; * * * that goes on all the time. * * * Q. Now, Mr. Cox, you were talking about carloads of soybean meal, when you gave those answers, were you not? A. Yes, sir. * * * I was talking about all feed ingredients in general. Q. Well, including soybean meal? A. Including soybean meal." He further testified: "Q. And there will be occasions, where brokers communicate with you—I mean—excuse me—where other mills will get an excess supply of soybean meal or cottonseed meal or something like that, on hand, and call you, and say, 'We have some extra cars of soybean meal, if you can use any, I wish you would buy it from us.' Isn't that customary, in your business now? A. Yes, we help one another out that way."

It was also shown that appellee did not completely empty a bin of soybean meal before putting another carload in the bin, and it cannot be said to have been conclusively established that all of the soybean meal which went into the manufacture of the chunkets sold to appellant came from the four processors which appellee claimed did not use trichloroethylene as a solvent. Appellee never had a chemical analysis made of the soybean meal, although its representatives knew that trichloroethylene-extracted soybean meal was injurious to cattle, and that some processors used that method. Appellee's buyer also testified that as a precaution against acquiring soybean meal which had been extracted with trichloroethylene, he would learn from the broker (or the seller) the identity of the processor. He further said: "Q. But you took—you continued to buy through brokers and you took no precautions, other than to ask somebody, on the telephone, 'Now, is this—where does this come from?' Now, that's the only precaution you took, isn't it? A. That is what all the buyers— Q. I am asking you—I am not interested in all of them—I am asking what you did. A. That's what I did. Q. And that's all you did? A. Yes, sir."

Nor do we think the fact that no other purchaser of the chunkets, and there were many, complained of any injury to his cattle conclusively shows that appellant's cattle were not injured by consuming that feed. Cattle separated from appellant's ranch only by a fence, which were not fed the chunkets, did not become diseased. It is not denied that appellant's cattle consumed the feed

in question, nor that they became diseased and many of them died. There was evidence that they were not afflicted with parasitism, hyperkeratosis, anthrax, or any other infectious disease; there was evidence that they had adequate nourishment. One veterinarian testified that in his opinion the cause of their deterioration was trichloroethylene poisoning; another veterinarian testified that even if that chemical had not been found in the feed, he would be justified in making a tentative diagnosis of trichloroethylene-treated meal poison, and that the finding of any trace of that chemical would make the diagnosis conclusive. One chemist testified that he found trichloroethylene in the chunkets. Although appellant's case is supported only by circumstantial evidence, in our opinion that evidence has sufficient probative force to require the submission of the case to a jury. International Milling Co. v. Jernigan, Tex.Civ.App., 191 S.W.2d 526; Jacob E. Decker & Sons, Inc., v. Capps, 139 Tex. 609, 164 S.W.2d 828, 142 A.L.R. 1479.

■ Appellant asks that the judgment of the trial court be reversed and judgment here rendered for him. It is frequently the duty of an appellate court to render the judgment which should have been rendered by the trial court. Rule 434, Texas Rules of Civil Procedure. But in this case appellee points out that the trial court recited in its final judgment that the verdict "was contrary to the overwhelming weight and preponderance of the evidence," although in rendering judgment non obstante veredicto the court further held that there was no evidence raising a fact issue. There are other complaints of the rulings of the court on the admissibility of evidence presented by appellee's counter-points. In such a situation, we think it is our duty to remand the cause rather than to render judgment for appellant. Le Master v. Fort Worth Transit Co., 138 Tex. 512, 160 S.W. 2d 224. The question of the insufficiency of

the evidence, in contradistinction to no evidence, is not before us, and is not decided.

The judgment rendered non obstante veredicto is reversed and the cause is remanded to the trial court with instructions to enter a judgment on the verdict.

### On Motion for Rehearing

■ Appellant has filed a motion for rehearing in which he directs our attention to our failure to consider appellee's cross-points that the trial court erred in admitting over its objection the testimony of appellant that in his opinion the feeding of the chunkets caused the damage to his cattle, and that the court erred in excluding proof offered by appellee that appellant had been indicted for and had pleaded guilty to charges of running a public gambling house; and appellant says that under Rule 324, T.R.C.P., it is our duty on this appeal to consider those cross-points, and he asks that both be overruled. We agree that we should pass on them.

■ We think it was error to permit appellant to testify that in his opinion the cause of the disease and death of his cattle was "these Bewley chunkets I fed." That was the very issue to be decided by the jury. It is believed that under the situation presented by this record, only a medical expert could testify to such opinion. Appellant did not qualify as an expert on the effect upon cattle of trichloroethylene in their feed. He did not profess to know anything about it. He relied upon circumstances to prove that the chemical was in the feed consumed by his cattle, and offered experts in veterinary medicine to give their opinions as to the effect of such chemical in cattle feed, as well as their opinion as to the cause of the damage to appellant's cattle. We are aware of authorities holding that experienced cattlemen may give their opinions as to factors involved in bringing about deteriorating conditions of cattle, when

it appears that they are better qualified than the average juror on the subject under investigation; but we are not able to agree that a cattleman, however experienced in raising and feeding cattle, may give his opinion on a matter requiring scientific knowledge, and where he does not profess to have such knowledge. It amounts to permitting appellant to say, in effect, that he had examined the findings of the chemist and the medical experts, and they were correct.

The issue as to what caused the disease and death of the cattle was very close. Appellee says—and there were circumstances to support the assertion—that the evidence practically, if not completely, excluded trichloroethylene as the cause, and the finding that the feed contained that chemical could be arrived at only by surmise and conjecture. While we have held that the evidence amounts to more than that, we are persuaded that the testimony complained of could be peculiarly hurtful in the situation presented here. In the opinion of a majority of the court, the error in admitting it was calculated to and probably did turn the scales and cause the jury to find against appellee on that crucial point.

■ Appellee told the trial court that it was not offering proof of appellant's indictment for and pleas of guilty to the charges of running a public gambling house, "for the purpose of impeaching the character of the Plaintiff," but "solely and only for the purpose of contradicting the sworn testimony of the plaintiff" to the effect "that he had never been a professional gambler in his life and that he had never made any part of his living from gambling and that he did not even know how to play cards and shoot dice." Appellee's argument is that appellant "was presented as being a man who had been

in the cattle business all of his life and that this was his sole and only business. Certainly, the effect of this opinion (as to the cause of his cattle's damage), erroneously allowed in the first place, would have been materially destroyed if defendant had been allowed to show that this was not his sole and only business." We are impressed with this argument; but appellant was not charged with gambling, and he admitted that gambling had been going on at a public place which he owned and controlled. We do not think the exclusion of this evidence constituted reversible error.

We think the error discussed requires a new trial under Rule 324, as construed in De Winne v. Allen, Tex., 277 S.W.2d 95, and in Happ v. Happ, Tex.Civ.App., 160 S.W.2d 227. Accordingly, that part of our original judgment instructing the trial court to enter a judgment on the verdict is withdrawn, and the cause is remanded for a new trial.

MASSEY, Chief Justice (dissenting).

I do not agree with my brothers upon the propriety of reversal because of appellant's opinion testimony. While I concur that such testimony was improper, I do not believe that appellee has discharged the burden of demonstrating that it probably caused the jury to return a verdict other than the verdict it would otherwise have returned but for the error. T.R.C. P. 434.

I would adhere to the original judgment instructing the trial court to enter a judgment on the verdict, thereafter to entertain the defendant's motion for new trial on grounds which he has informed this court he wishes to present, and upon which the trial court has not yet had opportunity to pass.