**Mrs. Frances Cunningham, Plaintiff-Appellant, v. MacNeal Memorial Hospital, Defendant-Appellee.**

**Gen. No. 51,893.**

First District, Second Division.
July 8, 1969.
Rehearing denied August 5, 1969.

BURKE, J., dissenting.

Horwitz, Anesi & Ozmon, of Chicago (Dario A. Garibaldi, of Flossmoor, of counsel), for appellant.

Howard, French & Healy, of Chicago (John C. Healy, of counsel), for appellee.

MR. JUSTICE McCORMICK delivered the opinion of the court.

The plaintiff, Mrs. Frances Cunningham, was admitted to MacNeal Memorial Hospital in May 1960. While there she received several transfusions of whole blood and was infected with serum hepatitis, requiring that she have additional hospitalization.

The plaintiff filed a complaint praying for judgment in the sum of "$50,000.00 or such greater or lesser sum as the court or jury may award." On October 14, 1966, a second amended complaint was filed, the one with which we are concerned. In that complaint the plaintiff made the following allegations, among others:

> "That the defendant, MacNeal Memorial Hospital, as ancillary to the services rendered to the plaintiff sold and supplied her blood for the purposes of transfusion in the treatment of her condition. . . .

"That the defendant, MacNeal Memorial Hospital, in selling and supplying, had a duty to process and distribute the blood that was used in the transfusion of the plaintiff so that it was not defective and did not become unreasonably dangerous when put to the use for which it was processed, sold and distributed.

"That the blood sold and supplied by the defendant, . . . was defective and in an unreasonably dangerous condition and was in such condition at the time that it left the hands of the defendant, . . . .

"That as a direct and proximate result of the defective and unreasonably dangerous condition of the blood that was used in the plaintiff's transfusion, the plaintiff then and there was caused to and did contract serum hepatitis.

"The plaintiff at no time had any knowledge of the defective condition of the blood and was at all times herein mentioned in the exercise of due care and caution for her own safety.

"That, as a direct and proximate result therefor, the plaintiff was caused to require further hospitalization and seek further medical attention, and caused her to suffer great pain and discomfort and that she was required to and did lose long periods of time from her employment resulting in a loss of wages and income and that it is believed that her disability and condition were and are permanent in nature."

The defendant did not file an answer to the complaint; instead, it filed a motion for judgment on the primary ground that the plaintiff was erroneously seeking to state a cause of action "against this defendant upon the theory that blood is a product, that such product was furnished in a defective and unreasonably dangerous condition and that by reason thereof defendant is strictly liable to plaintiff for her alleged damages." The motion

76

was presented on October 14, 1966, on which date the trial court entered an order stating:

> "It is further ordered that defendant's motion for judgment on the pleadings be and it is allowed; and, that judgment be and it is hereby entered in favor of defendant herein; . . . ."

The plaintiff filed a notice of appeal in which she requested that the order and judgment be set aside or reversed and that the defendant be ordered to answer plaintiff's second amended complaint, and that the cause be ordered to be set for trial.

The question before this court is whether or not the doctrine of strict tort liability, as laid down in Suvada v. White Motor Co., 32 Ill2d 612, 210 NE2d 182 (1965), is applicable. The defendant contends that whole human blood is not a product, nor can it be the subject of a sale; and that the hospital, through its agents, merely performs a service in giving a blood transfusion.

In defendant's brief it is noted that "none of the [blood] cases attaches liability or indicates the potential attachment of liability to a hospital for the furnishing of blood, . . . ." While it may be true that no case has directly attached liability to a hospital for the "furnishing of blood," we cannot agree that none of the cases had indicated the potential attachment of such liability.

It is, of course, evident to any thinking person that with advanced scientific knowledge our daily lives are considerably changed, and the law also changes to cope with such advancement. As early as Wiedeman v. Keller, 171 Ill 93, 49 NE 210, our Supreme Court indicated in strong terminology its preference for imposing liability on retailers selling unwholesome meat, whether they were aware of its unwholesome condition or not. In that case Henry Keller, the defendant, was in the business of buying and selling meats and other foods at retail prices for domestic use. Although the court spoke in terms

77

of implied warranty it would appear that the most important point in the case is that the warranty's support was seen to be in public policy. The following language from that opinion (page 99) is relevant to the case before us:

> "In an ordinary sale of goods the rule of caveat emptor applies, unless the purchaser exacts of the vendor a warranty. Where, however, articles of food are purchased from a retail dealer for immediate consumption, the consequences resulting from the purchase of an unsound article may be so serious and may prove so disastrous to the health and life of the consumer that public safety demands that there should be an implied warranty on the part of the vendor that the article sold is sound and fit for the use for which it was purchased. It may be said that the rule is a harsh one; but, as a general rule, in the sale of provisions the vendor has so many more facilities for ascertaining the soundness or unsoundness of the article offered for sale than are possessed by the purchaser, that it is much safer to hold the vendor liable than it would be to compel the purchaser to assume the risk."

In the instant case the defendant's brief cites a number of cases and states that the reason for citing them is that "they have certain factors inextricably common to any case predicated upon strict tort liability. One of these factors is whether or not there has been a sale, within the meaning of the law, by the defendant to the plaintiff. Certain of these cases make a distinction between the furnishing of blood by a hospital and the furnishing of blood by a blood bank. However, none of the cases attaches liability or indicates the potential attachment of liability to a hospital for the furnishing of blood, . . . ." The defendant asserts that no liability can attach

to it since nothing has been purchased. We feel that this conclusion is too simple and that to maintain an artificial barrier around blood is not sensible.

The first case which imposed strict tort liability in Illinois was Suvada v. White Motor Co., supra, in which the Illinois Supreme Court pointed out that Illinois law does not require a showing of privity of contract for one to maintain an action for breach of implied warranty; and the court further held that the rule of privity of contract is not applicable, stating at page 617:

> "As early as 1847 this court approved of the holding in Van Bracklin v. Fonda, (NY 1815) 12 Johnson, 468, 7 Am D 339, that there is an implied warranty (strict liability) in the sale of food. (Misner v. Granger, 4 Gilm 69.) Dean Prosser has traced the theory of strict liability in the sale of food to the year 1431. (Prosser, Assault on the Citadel, 69 Yale LJ 1099.)"

The court cited and quoted from Wiedeman v. Keller, 171 Ill 93, 49 NE 210, and further pointed out that actions for breach of warranty in a food case by a party not in privity with the seller or the manufacturer are sanctioned on the ground that the implied warranty of the manufacturer or seller runs with the sale of the article. At page 618 the court in Suvada quoted from Jacob E. Decker & Sons v. Capps, 139 Tex 609, 617, 164 SW2d 828, 831–2, that "Here the liability of the manufacturer and vendor [of food] is imposed by operation of law as a matter of public policy for the protection of the public, and is not dependent on any provision of the contract, either expressed or implied." At page 619 the court in Suvada stated: "The losses caused by unwholesome food should be borne by those who have created the risk and reaped the profit by placing the product in the stream of commerce."

Suvada is a landmark case in Illinois law, and while it is true that the question actually decided in it was one of strict liability with reference to an action brought on account of a defective brake system for a tractor, nevertheless, the import of the decision lies in the fact that the court openly laid down the rule that liability was based, not on warranty, but rather on public policy.

It would appear that the real reason some would refrain from calling human blood a product is the belief that those dealing in it are doctors, hospitals and blood banks, who perform a meritorious service for the community and are entitled to preferential treatment from the law. However, our Supreme Court has indicated that a hospital should not be treated any differently from any other organization; at least, insofar as the rules of negligence are concerned. Darling v. Charleston Community Memorial Hospital, 33 Ill2d 326, 211 NE2d 253. In other words, we feel that those favoring special protection for hospitals of the kind they had enjoyed before the Darling decision, would read back into the law a preferential treatment for hospitals by circuitous means, such as concluding that blood is not a product, and that those handling it are to be treated differently from those handling "true" products.

In the instant case the defendant argues that blood cannot properly be classified as a product. In this connection we note that a Federal Trade Commission opinion was handed down in June 1964. The case involved the allegation that a hospital association, its members and fourteen hospital pathologists had illegally hampered and restrained "the exchange, sale and distribution of human blood." In the Matter of Community Blood Bank of the Kansas City Area, Inc., docket number 8519, reported in FTC, 22,023 (issued June 8, 1964). The synopsis of the opinion noted that the examiner had rejected various "jurisdictional issues," among them the claim that human blood was not subject to FTC control be-

cause blood was not an article of commerce. The synopsis quoted from the examiner's findings that whole human blood "is viable human tissue mixed with an anticoagulant in a sterile container which must be stored and refrigerated and the admixture is a commodity and/or article of commerce under the administrative practice of National Institutes of Health," and thus concluded that blood is subject to trade and commerce within the meaning of the terms as used in the FTC Act. It would then appear that for federal control purposes blood is considered an article of commerce and is subject to the prohibitions of federal statutory regulations; and that a federal agency has seen fit to classify blood as a product of commerce, thereby attaching potential penalties for the misuse of blood as would attach for the misuse of any other product under federal supervision.

Two federal district court opinions also evince a judicial attitude favoring an application of the word "product" to blood. In United States v. Calise, 217 F Supp 705 (SDNY), the defendant was charged in an 80-count indictment with several violations of the Public Health Service Act and the Federal Food, Drug and Cosmetic Act. Part of the offense charged involved a mislabeling of packages or containers. Under 42 USC 262(b) it is an offense to mislabel packages or containers ". . . of any virus, serum, toxin, antitoxin, or other product aforesaid; . . . ." The defendant had argued that that portion of the indictment alleging mislabeling of whole human blood did not allege an offense since "blood" was not a serum and therefore not within the purview of section 262. In rejecting this position the court said at page 708: "It cannot be said as a matter of law that the statutory terms do not include any serous fluid used for medical purposes."

In United States v. Steinschreiber, 218 F Supp 426 (SDNY), the defendant was charged in part with unlawful transportation of unlicensed normal human plasma.

81

The indictment was attacked on the ground that section 262 did not cover human plasma, that normal human plasma was not "a therapeutic serum or analogous product . . . applicable to the prevention, treatment or cure of diseases or injuries of man." Therapeutic serum or analogous products were statutorily classified as "virus, therapeutic serum, toxin, antitoxin or analogous product, or arsphenamine or its derivatives . . . ." The court gave plasma its "commonly accepted meaning" and held the indictment sufficient, leaving for resolution at trial whether the Government could prove as a scientific fact that plasma was a therapeutic serum.

We feel that these cases support the view that, given a common sense meaning of terms such as whole human blood or plasma, one is led to the conclusion that they are within the general category of items which lend themselves to legislative and/or judicial control. We believe that this is the correct view and that there is no important meaningful distinction between blood, food or other products for the purposes here under consideration.

There have been opinions which have afforded protection to organizations such as hospitals and blood banks by finding that the transaction whereby the patient obtains the blood is not a sale, but rather is a service. The most notable of these cases is Perlmutter v. Beth David Hospital, 308 NY 100, 123 NE2d 792 (reh. den. 308 NY 812). However, before discussing the Perlmutter decision, we feel that several observations should be made concerning the judicial climate in New York regarding the general topic of strict liability.

In William L. Prosser's article, "The Assault Upon the Citadel (Strict Liability to the Consumer)," 69 Yale LJ 1099 (1960), he notes that New York was one of "two small islands of resistance" which continued to hold out against extending the impact of the famous case, MacPherson v. Buick Motor Co., 217 NY 382, which had abol-

82

ished the necessity for showing privity of contract between the manufacturer and the consumer before an action would lie against the manufacturer by the consumer. Furthermore, at page 1109 Dean Prosser informs us that New York was also among those jurisdictions which rejected strict liability in food cases and continued to hold sellers of food not liable to consumers in the absence of negligence or privity of contract. Temple v. Keeler, 238 NY 344, 144 NE 635, (in which the court held that a restaurant which sold unwholesome food was liable on an implied warranty). Illinois, on the other hand, has long since adopted strict liability in such cases. (See cases cited at page 1107 of Dean Prosser's article.) With this background of New York's hostility to adoption of the principles of strict liability, the Perlmutter case is somewhat easier to comprehend.

In Perlmutter the trial court, as in the case before us, dismissed plaintiff's complaint for failure to state a cause of action. The plaintiff allegedly sustained injuries from an impure blood transfusion which he had received while a patient in the defendant hospital. The Court of Appeals, in a four to three opinion, held that a paying patient in a hospital who receives impure blood through a transfusion cannot sue the hospital on the theory of a breach of warranty because the furnishing of blood was an incidental adjunct to the hospital services, and thus was not within the provisions of the Sales Act; therefore, the theory of breach of warranty was not available. In the course of the opinion the court discussed its view of the relationship between hospital and patient. At page 104, the court states that the contract between hospital and patient

"is clearly one for services, and, just as clearly, it is not divisible. Concepts of purchase and sale cannot separately be attached to the healing materials—such as medicines, drugs or, indeed, blood—

83

supplied by the hospital for a price as part of the medical services it offers. . . . ' "Sale" and "transfer" are not synonymous,' and not every transfer of personal property constitutes a sale."

The court concluded that the service aspect of the relationship predominated, and therefore, the transaction involving the transfer of blood to the patient was not a sale within the New York Sales Act.

There was a strong dissent in the Perlmutter case which pointed out that for various reasons New York had granted charitable hospitals immunity from liability for negligence of their properly selected physicians and nurses. At page 110 of the opinion, the dissent states that this "rule has sometimes worked great hardship on persons injured," and that the rule should therefore not be applied. As we have previously mentioned, the Illinois courts have restricted such immunity, and we agree with the dissent that the act of the hospital in selling blood should not be shielded from liability.

Other cases have followed the rule laid down in Perlmutter; Koenig v. Milwaukee Blood Center, Inc., 23 Wis 2d 324, 127 NW2d 50; Dibblee v. Dr. W. H. Groves Latter-Day Saints Hospital, 12 Utah2d 241, 364 P2d 1085. From the opinion in Dibblee it is apparent that the court felt hospitals were havens entitled to special protection not applicable to the rest of society.

In Russell v. Community Blood Bank, Inc. (Ct App Fla), 185 So2d 749, the court held that a cause of action existed against a blood bank for breach of implied warranty, and that the plaintiff could recover, if it could prove that the blood bank failed to detect or remove a harmful substance which was capable of removal. In commenting on the distinction of "service versus sale," the court stated at page 752: "It seems to us a distortion to take what is, at least arguably, a sale, twist it into the shape of a service, and then employ this transformed material in erecting the framework of a

major policy decision." The court then expressly applied to the suit against the blood bank the reasoning of a prior decision which rejected the service theory in the sale of food by a restaurant.

In Gottsdanker v. Cutter Laboratories, 182 Cal App2d 602, 6 Cal Rptr 320 (1960), damages were recovered on behalf of two children who contracted polio from Salk vaccine which contained a live virus. Dean Page Keeton, in his article, Products Liability—Liability without Fault and the Requirement of a Defect, 41 Tex L Rev 855 (1963), stated at page 860: "At the time the case [Gottsdanker] came before the court, California, . . . had already imposed liability on the manufacturer-seller of food products." That statement is, of course, applicable to the Illinois law at the present time. Dean Keeton further stated: "Therefore, it was a logical and almost necessary extension to apply the same principle to drugs." It is difficult to see why blood used in transfusions should be distinguished from drugs; both are intended to be used in the human body for the purpose of healing.

■ We believe it is realistic and reasonable to hold that a sale is involved in the transaction whereby the patient comes into possession of blood. On oral statement in the case before us counsel for the hospital stated that a sale was not involved; that rather, there was an exchange of personal property for remuneration. That is an attempt to make a distinction without a difference. We agree with the opinion in Russell v. Community Blood Bank, Inc., supra, that to take a sale and twist it into a service is a distortion. We feel that under the holdings in the Suvada and the Darling cases, such a process would be wrongfully destructive of the framework erected by the Illinois Supreme Court.

In the instant case the defendant hospital urges that there is no way to determine or control the contamination of blood by hepatitis serum, and therefore, it would be unjustifiable to impose liability on the hospi-

85

tal. In particular, the defendant says that the only means by which the disease can be detected is of no value since use of the method results in the destruction of the whole blood; and that since the item cannot be made safe under our present knowledge, the hospital should not be held to strict liability. In her brief the plaintiff answers that blood can be made relatively safe for use by means of careful control over the source (the donors); and that recent research indicates a far greater possibility of an infected carrier living in a crowded, low-income area than in a middle-class residential area. In addition, plaintiff indicates several tests which can be taken to indicate whether a particular donor might be a carrier.

It is our feeling that argument on either side of this issue is premature at this point. As stated in United States v. Steinschreiber, supra, such matters are for resolution at the trial level. Also, see dissent in Perlmutter v. Beth David Hospital, supra. We have before us only the complaint, the motion, and the order of dismissal. On the basis of such a record, we cannot determine that one party or the other is correct in its position with reference to the possibility of making the blood safe. The defendant hospital may choose to defend its position at trial on the ground that blood is incapable of being made safe, and we will not make any statement or any point beyond the issue presently before this court.

■ That issue is whether or not the plaintiff has stated a cause of action in her complaint. It is our finding that the plaintiff has stated a cause of action and is entitled to try to prove her case. The defendant has moved to strike portions of plaintiff's brief and abstract and to dismiss the appeal. All of these motions were taken with the case and all of them are now denied.

The judgment of the trial court sustaining defendant's motion to dismiss the complaint, and the judgment en-

tered in favor of the defendant are reversed. The defendant is ordered to file an answer to plaintiff's second amended complaint, and the case shall proceed to trial.

Reversed and remanded.

LYONS, P. J., concurs.

BURKE, J., dissents:

We are asked to decide whether the doctrine of strict tort liability includes within its purview, a hospital which ancillary to the services rendered a patient furnishes, by way of transfusion, blood which contains serum hepatitis. The complaint herein does not seek recovery under the theory of negligence. A leading case in this field, Perlmutter v. Beth David Hospital, 308 NY 100, 123 NE2d 792, pointed out that the main object sought to be accomplished by the hospital in that case was the care and treatment of the patient and that the supplying of blood by the hospital was entirely subordinate to its paramount function of furnishing trained personnel and specialized facilities in an endeavor to restore plaintiff's health. That the furnishing of blood by a hospital is an adjunct to the contract for services and not a sale was similarly held in Koenig v. Milwaukee Blood Center, Inc., 23 Wis 2d 324, 127 NW2d 50; Goelz v. J. K. and Susie L. Wadley Research Institute and Blood Bank (Tex Civ App), 350 SW2d 573 (1961). In Dibblee v. Dr. W. H. Groves Latter-Day Saints Hospital, 12 Utah2d 241, 364 P2d 1085, the court said, p 243:

> "We do not say that hospitals should be immune from negligence, but we think they should not be strapped with an insurability of blood purity, absent negligence. . . . To conclude otherwise could lead to the unhappy and unfortunate conclusion that such

institutions, of necessity, might require the patient (perhaps unconscious) to bring with him his own transfusion of blood."

Section 1606 of the California Health and Safety Code reads:

"The procurement, processing, distribution or use of whole blood, plasma, blood products and blood derivatives for the purpose of injecting or transfusing the same or any of them, into the human body is not a sale but the rendition of a service."

The State of Arizona in its Statutes, section 36–1151, Public Health and Safety, and in the case of Whitehurst v. American Nat. Red Cross, 1 Ariz App2d 326, 402 P2d 584, follow the philosophy expressed in the Perlmutter case.

In Suvada v. White Motor Co., 32 Ill2d 612, 210 NE2d 182, our Supreme Court, 621, noted that the views "herein expressed coincide with the position taken in 402A of the American Law Institute's Revised Restatement of the Law of Torts" and calls attention to the fact that the section provides:

"(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

"(a) the seller is engaged in the business of selling such a product, and . . . ."

Each of the cases which has sprung from the doctrine of strict tort liability has dealt with a commercially prepared for profit product. Blood, the essence of life has come to us from Him who created that life.

Comment "k" in the Restatement of the Law (Second) Torts, § 402A indicates that: "There are some products

which, in the present state of human knowledge, are quite incapable of being made safe for their intended and ordinary use." The authors of the comment conclude that:

> "The seller of such products, again with the qualification that they are properly prepared and marketed, and proper warning is given, where the situation calls for it, is not to be held to strict liability for unfortunate consequences attending their use, merely because he has undertaken to supply the public with an apparently useful and desirable product, attended with a known but apparently reasonable risk."

The defendant has not placed any reliance upon the doctrine of charitable immunity. The furnishing by a hospital of blood to a patient, through transfusion, is not a sale of the blood but is incidental to the services for which the patient has contracted. The trial judge was right and the judgment should be affirmed.