**FORD MOTOR COMPANY, Appellant,**

v.

**RUSSELL & SMITH FORD COMPANY et al., Appellees.**

**No. 531.**

Court of Civil Appeals of Texas, Houston (14th Dist.).

Nov. 17, 1971.

Rehearing Denied Dec. 15, 1971.

Second Rehearing Denied Jan. 5, 1972.

William E. Matthews, Baker & Botts, Houston, for appellant.

Tom Lorance, Lorance & Thompson, John B. Murphrey, W. James Kronzer, John M. O'Quinn, Nick C. Nichols, Brown, Kronzer, Abraham, Watkins & Steely, Houston, for appellees.

BARRON, Justice.

This suit was filed in the District Court of Harris County, Texas, by Steve J. LaRocca against Russell & Smith Ford Company by reason of personal injuries sustained by LaRocca when he was burned by steam and hot water from a split or burst top radiator hose on a 1965 Ford Econoline van he had purchased from Russell & Smith Ford, an authorized dealer in Ford products situated in the City of Houston. The above defendant later joined Ford Motor Company as a third-party defendant for indemnity. After trial to a jury and based upon the verdict of the jury, the trial court entered judgment in favor of LaRocca in the sum of $109,224.00 against Russell & Smith Ford, and further entered judgment in favor of the third-party plaintiff, Russell & Smith Ford, against Ford Motor Company for full indemnity.

Ford timely filed its motion for new trial in which it attacked all the findings of the jury on grounds of no evidence, as being against the overwhelming weight of the evidence, and on other grounds hereinafter mentioned. It also filed motion for judgment non obstante veredicto and to disregard certain special issues as being supported by no evidence. Russell & Smith, the retail dealer, filed a motion for new trial on the grounds that answers to special issues 1–5 fixed liability only on Ford in favor of plaintiff, and that the jury's answers to special issues numbers 6 and 7, regarding the location of the engine access cover, fixed liability on Ford. Complaint was also made in said motion regarding double and exaggerated damages as found by the jury. The latter motion was directed at the portion of the judgment in favor of LaRocca against Russell & Smith. The trial court overruled all the above motions.

Both Russell & Smith and Ford filed written notices of appeal. No appeal, however, was perfected by Russell & Smith. On April 20, 1971, Ford filed its appeal bond naming Steve J. LaRocca as obligee, in an apparent attempt to appeal the judgment in favor of LaRocca. However, on August 31, 1971, Ford filed its "amended" appeal bond naming only Russell & Smith Ford Company, as obligee. No objection in any respect was made, and we permitted the filing of the amended appeal bond. See Rules 404 and 430, Texas

Rules of Civil Procedure. But we are met at the outset with a motion filed by LaRocca for dismissal and severance as to him with an affirmance of the judgment entered below on LaRocca's behalf against Russell & Smith. We regard Ford's appeal as against Russell & Smith in the indemnity suit to be an independent suit against the third party defendant, Ford. See Union Bus Lines v. Byrd, 142 Tex. 257, 177 S.W.2d 774 (1944). Where one party appeals from a judgment rendered against him, and other parties fail to appeal, the causes of action being separate and distinct, the judgment as to the parties not appealing becomes final. Speckels v. Kneip, 170 S.W.2d 255 (Tex.Civ.App.-El Paso 1942, writ ref'd); Eggleston v. Primrose Petroleum Co., 47 S.W.2d 359 (Tex. Civ.App.-San Antonio 1932, writ dism'd); Shamburger v. Glenn, 255 S.W. 815 (Tex. Civ.App.-Amarillo 1923, no writ); De La Vega v. League, 2 Tex.Civ.App. 252, 21 S. W. 565 (Galveston 1893, no writ); 3 Tex. Jur.2d Appeal and Error Sec. 340, p. 598 (1959). The indemnity action being separate and distinct from the judgment in favor of LaRocca against Russell & Smith, the motion filed by LaRocca to sever the causes and dismiss the appeal is granted and it is so ordered. Thus, we review only the judgment in favor of Russell & Smith, the dealer, against Ford Motor Company, the manufacturer, who has appealed on the question of indemnity. Ford Motor Company can be given full and effective relief without reversing the judgment of LaRocca, and Russell & Smith is not required to relitigate LaRocca's action to establish its right to indemnity or contribution from Ford Motor Company.

The jury found in substance as follows:

1. The cooling system on the Econoline vehicle was defectively designed by Ford Motor Company. "Defectively designed" and "unreasonable risk of harm" were properly defined.

2. Such defective cooling system was a producing cause of the occurrence in question.

3. The cooling system on LaRocca's Econoline van was defective with the "Climatic Air" air conditioner on the vehicle.

4. It was reasonably foreseen and anticipated by Ford that dealers, users or consumers would cause to be installed air conditioners of the "Climatic Air" type on Econoline vehicles of the type sold Steve J. LaRocca in July, 1965.

5. Such defective cooling system was a producing cause of the occurrence in question. (Conditionally submitted in the event of an affirmative answer to issue number 3.)

6. The location of the engine access cover inside the vehicle exposed a user such as the plaintiff to an unreasonable risk of harm.

7. Such location was a producing cause of the occurrence.

8. Prior to July, 1965, Ford represented to Russell & Smith Ford that installing air conditioning of the "Climatic" type on the 1965 Econoline with the 240 engine would not render the cooling system defective.

9. Russell & Smith's installing the "Climatic" type air conditioner on LaRocca's vehicle was in reliance upon the above representation.

10. Such representation as above was a producing cause of the occurrence in question.

11. Ford failed to give such warning to Russell & Smith Ford concerning the installation of air conditioning on the vehicle involved as would have been given by a manufacturer using ordinary care.

12. Such failure above was a *proximate* cause of the occurrence in question.

13. When LaRocca raised the engine cover, he did not actually know and fully appreciate the nature and extent

of the danger of being burned by steam or water because of the defective cooling system.

14. Unanswered by instruction.

15. The installation of the air conditioner in question on the vehicle did not constitute a substantial change in the design of the vehicle. "Substantial change" was defined as such change in the vehicle in question that the manufacturer would not have reasonably foreseen and anticipated.

16. The damage issue.

The appellant, Ford Motor Company, has brought forward forty-five points of error. The only cross-point of error, brought forward by appellee, Russell & Smith, was to the effect that the verdict does not constitute a verdict against Russell & Smith sufficient to support any judgment against it without likewise forming the basis for Russell & Smith's judgment against Ford for indemnity.

Steve J. LaRocca testified that he purchased the Econoline van in question from Russell & Smith Ford Company (hereinafter designated Russell), in July of 1965. That year's model was available with a new and larger engine, called a 240 cubic inch displacement engine, which was first installed in the 1965 model Econoline van, but which was marketed sometime in the fall of 1964. He purchased the larger engine because it was represented by Russell that the 240 engine was supposed to remedy overheating problems usual with this type of vehicle, and because the vehicle was able to handle an air conditioner. He would not have purchased the vehicle without air conditioning, and Russell agreed to and did install one. This was not LaRocca's first acquaintance with the Econoline van manufactured by Ford. He had owned two earlier versions and used them in his laundry delivery service. On both he had had a Climatic air conditioning unit installed, and on both he had experienced overheating problems which were ex-plained to Russell. During the year before he was injured, from July, 1965, until August 23, 1966, the date of his injuries, LaRocca had much trouble with overheating, particularly with the air conditioner on, but also with the air conditioner off in slow traffic and warm weather. The overheating, however, was worse with the air conditioner turned on and in use. About three or four months after he purchased the van the top radiator hose failed. From August to December of 1965 he took the vehicle back to Russell at least five or six times and complained that it was overheating. His answer was that "It don't overheat any more than most of them do." On July 21, 1966, about one month before the upper radiator hose burst injuring LaRocca, he took the vehicle to Russell for a thorough going over because he intended to take a trip Labor Day weekend. The cooling system was among his list of things to be checked or repaired. The mechanic at Russell who did the work testified that he checked the radiator hoses and the cooling system and that everything was all right. The hoses felt and looked to be in good condition.

On August 23, 1966, LaRocca left his home in the truck at his usual time, around a quarter of seven, to begin his laundry route. He picked up the laundry of several customers and took it to Milton's Cleaners about 9:00 o'clock and then went out again and made about a dozen other stops. He returned to Milton's Cleaners about 11:00 or 11:30. LaRocca was waiting for some laundry to be finished so he could deliver it that afternoon. Therefore, he did some paper work at Milton's Cleaners until about 1:30 p. m. Since this laundry was still not ready, he left to go to the bank. He was headed toward Fannin Bank on O.S.T. when the incident made the basis of this suit occurred. Traffic was medium, and it was a hot day. He recalled that he stopped for a traffic light at the intersection of Almeda and O.S.T. behind a line of traffic. After he started up and reached the intersection, he began hearing a thump-

ing or bumping sound that seemed to be coming from the engine. He had never heard anything like this before. He cleared the intersection and then pulled his truck over to the curb of the street. He cut the engine off and heard nothing. He then turned the ignition key back on and heard the noise again. He turned the key off again, and the noise went away. He thought that something had fallen inside the engine and was bumping. He then reached over, unlatched the engine cover, lifted the engine cover, and started looking inside the engine compartment. He does not recall exactly how long he looked at the engine before the top radiator hose burst, but it may have been a matter of minutes or only thirty seconds or so. That is the extent of his recollection until he woke up in the hospital four or five days later. It is clear that the top radiator hose burst from the high temperature and pressure inside the cooling system and sprayed hot scalding water on LaRocca. He testified that he heard no spewing noise or any kind of noise that would indicate to him that hot water was about to escape the cooling system, or that something was going to explode. LaRocca testified that he had never been warned not to raise the hood on the engine when it was overheated. However, on deposition in evidence he testified that he was afraid to raise the hood when the van was overheating, and that he had never raised it before.

Lavert LaRue, LaRocca's witness, testified that he had had personal experience working on the type of vehicle in question, both with and without air conditioners, and he qualified as an expert on the cooling systems of various vehicles with and without air conditioners, particularly in weather generally experienced in Houston in the summertime. He explained to the jury how the cooling system works on all motor vehicles including the Econoline van in question. The engine is cooled by water that flows through cavities in the engine block called water jackets. This water is circulated by a water pump turned by the engine from the engine block into the radiator through the top radiator hose. The radiator consists of a series of thin tubes arranged vertically with horizontal fins. The water flows down through these tubes transferring the heat to the tubes and fins. The tubes and fins are in turn cooled by air. The flow of air through the radiator is an important factor in the operation of the cooling system. Both the temperature of the air passing through the radiator and the amount of air passed through it are important factors. On a hot day, when the temperature of the outside air is high, the radiator's task of cooling the water is made more difficult, and the engine runs hotter. Similarly, if anything is placed in front of the radiator to block the flow of air through it, as was done with the condenser in this case by the air conditioner installed at the direction of Russell, the task of the radiator is also made more difficult and the engine runs hotter. The size of the radiator is also important. LaRue further stated that his experience was that this type of vehicle would consistently overheat and boil the water on a hot summer day in traffic even without an air conditioner, and that if the radiator hose is exposed to overheating for a period of time, it naturally becomes brittle and weak and will deteriorate to a point where it will burst under the pressure caused by overheating. In an ordinary vehicle, such as a passenger car, when the vehicle is cooling properly the radiator hose will normally last about two years. But his experience with Econoline vans even without an air conditioner shows that a hose has to be replaced on the average of every six months because of the abnormal deterioration caused by the heating problems.

LaRue's opinion was that the Econoline cooling system was defective because of its inadequate design. Most cars and trucks have the radiator up front, just behind the grill and front bumper. However, the radiator and engine are recessed back from the front grill in a 1965 Econoline van. The top of the engine and radiator are above the floor board and just to the right

of the driver. The effect of having a small opening from the front of the vehicle and requiring the air to make a right turn in order to get up to the radiator operates to restrict the flow of air through the radiator. Additionally, the engine cover came down more than half way over the front of the radiator which further operated to restrict the flow of air through the radiator, and the radiator was too small in capacity. It held 12½ quarts of water and the same size engine on other Ford vehicles had 14 quart radiators. LaRue further stated that the overheating problem could be corrected by moving the radiator up to the front of the vehicle to receive air directly through the grill and enlarging the cooling capacity of the radiator by using a larger radiator with a broader cross-section for air to pass through it and with a greater amount of water capacity. He stated that Ford had made both such changes in the 1969 Econoline with success.

The addition of air conditioning, in the opinion of LaRue, operated to aggravate the existing inadequacies of the cooling system. The air conditioner condenser, which is like a radiator and is used to cool the refrigerant, is mounted in front of the engine radiator so that air being drawn through the radiator to cool the engine is drawn first through the condenser to cool the refrigerant. This not only results in cutting down air flow through the engine radiator, but also raises the temperature of the air passing through the radiator. The cooling system on the 1965 Econoline was not adequate to handle an air conditioner.

Although LaRue knew of the danger in opening the engine cover on this type of vehicle after the key is cut off, his knowledge was a special knowledge which he acquired in his trade as a mechanic, and he would not expect Mr. LaRocca as an ordinary layman to know and appreciate this.

It was shown that Ford never gave any specific warning of the above conditions either to Russell or to LaRocca of such defectiveness as testified to by LaRue.

Calvin Cummings, testifying for Ford, is a quality control engineer with a bachelor of science degree in engineering physics and with eighteen years experience with Ford Motor Company. His department is responsible for devising the testing procedures for all parts and materials which go into Ford products, and he works directly with design engineers. Cummings testified that the cooling system was an adequate design for this unit, the 1965 Econoline, but with the add-on air conditioning it overtaxed the unit. The installation of an air conditioner would create problems of overheating with the resultant deterioration of the radiator hoses to the point where they were apt to burst. He would estimate that this type of vehicle with an air conditioner installed would have a life expectancy for radiator hoses of three to four months, after which time the hoses would have deteriorated to the point where they would be defective because of continual overheating. In stop and go traffic the vehicle loses "ram air", because of no motion at various stages, which can add to overheating. The 1965 Econoline's radiator had three rows of tubes. When the engine was moved forward, the square-inch area of such radiator is the same as the one used in the vehicle when the engine was between the two seats, 350 square inches. However, the present forward radiator has only two tubes and is an inch and a quarter thick, whereas the 1965 model has three tubes and is two and a quarter inches thick, an inch thicker. The thickening of a radiator has a higher cooling capacity. Consequently, there is no real difference in the 1965 and the 1969 models as to the engine and the radiator. The Climatic Air people changed the original equipment by changing the fan, and the condenser was installed very close to and in front of the radiator. Prior to the 1965 model, the Econoline had a 170 cubic inch displacement engine, but the 1965 model was equipped with a 240. Ford did not manufacture or test an air conditioner for the subject vehicle until the latter part of 1965, after the 1965 model was marketed

(a Rotunda model), and in connection with Ford's air conditioner the condenser was placed first on the roof of the vehicle and did not block the flow of air into the radiator. However, Ford now installs air conditioner condensers in front with a larger radiator. The 1965 Econoline was not designed for an air conditioner, and the installation of air conditioning would make the cooling system critical in hot weather. While indicating that Ford had no control over what was done with a Ford product in the hands of a dealer, he admitted that Ford could anticipate that dealers in Houston would install air conditioners on this model van. While Cummings' testimony offered acceptable explanations concerning the adequacy of the cooling system itself, most of his testimony must be rejected by an appellate court by reason of the verdict of the jury and the judgment of the trial court. See Biggers v. Continental Bus System, 157 Tex. 351, 298 S.W.2d 79, 303 S.W.2d 359, 365 (1957).

William Frank Russell testified that he is president of Russell & Smith Ford Company and that Ford sells and delivers cars to his dealership for sale to the public. Ford furnishes his dealership with various information, including lists of optional equipment, technical data and other literature concerning the automobiles. Ford also has personnel in the Houston area who come by his place of business to check on how things are going. They are available for him to call for help and technical advice. There are annual meetings held at various places where dealers in certain zones meet with representatives of Ford to discuss various problems which arise. This is called the "Dealer's Council."

Under questioning by his own counsel, Russell admitted that his business was a regular franchise Ford dealership; that Russell & Smith has obligations to Ford and Ford has obligations to Russell & Smith. However, the terms of their agreement and the nature thereof were never introduced into evidence. His dealership installed or had installed many Climatic air conditioning units on new Econolines being sold to customers before Ford started offering air conditioning as optional equipment in the fall of 1965 after the 1965 model was marketed. Ford, through its local representatives, was aware that Russell's dealership and other Houston area Ford dealers were installing these air conditioners on the 1965 Econolines, and if he, as one dealer, had refused to do so, he would have lost a portion of the market since many customers were going to have air conditioning or not buy the vehicle. The question was raised every year at the Dealer's Council meeting concerning air conditioning, the dealers' desire being that Ford enter the air conditioning field for such vehicles as optional equipment. Ford approved warranty work on the cooling system of these Econoline vans on the vehicle itself as manufactured by Ford but not on any added equipment such as air conditioning. The work done on the cooling system of LaRocca's Econoline one month before his injury was done under approved warranty.

Ford did not warn or instruct the dealer not to install air conditioning on the Econolines. Ford listed on its sales literature concerning the Falcon station wagon bus that air conditioning was optional equipment at the option of the dealer for installation, but while the Falcon station wagon bus is similar to the Econoline in that the Falcon is a family vehicle and the Econoline van is a business truck, *no optional equipment such as air conditioning was ever specifically authorized or even mentioned for the Econoline commercial van.*

Econoline vans first came out in 1961 with a smaller engine. The first air conditioners to be built and tested by Ford were for the 1966 Econolines. While LaRocca purchased his new vehicle in July, 1965 with air conditioning, he was sent to the Climatic Air Shop for installation.

Although Russell knew that much trouble was being experienced with overheating of the 1965 Econolines with air condi-

tioning shortly after they were marketed in the fall of 1964, and that the dealership had notice of the condition of LaRocca's vehicle, no warning of any kind was given by Russell's dealership to LaRocca 'though the fact of serious and continual overheating was known to them, including possible dangers. Russell admitted that he knew that the Climatic air conditioner would put a strain on the cooling system, and Russell's mechanics and service department had knowledge concerning the cooling system of the Econoline and had knowledge that the 1964 and 1965 models were overheating. Further admission was made that Russell continued with the Climatic air conditioner installation on the Econolines after the dealership had gained knowledge of the trouble, and he knew that the 240 engine did not cure the problems on the 1965 model. The reason Russell did not remove the Climatic after knowledge of trouble was that it would have cost more money to have done so. The dealership simply kept replacing the parts.

In 1969 the motor of the Econoline was moved to the front of the vehicle. While Russell could not specifically recall who it was at the Dealer's Council who told him about the air conditioning problems, he stated that as he understood it through Ford's factory representatives that the 240 engine was to solve two problems—one the underpower condition existent on the 170 engine and to give them a larger engine to handle the air conditioner. This information was given Russell prior to September of 1964.

The jury found by special issues numbers one and two that the cooling system in the Econoline was defectively designed by Ford, the manufacturer, and that such was a producing cause of the accident sustained by LaRocca. See Pizza Inn, Inc. v. Tiffany, 454 S.W.2d 420 (Tex.Civ.App.— Waco 1970, no writ); Greenman v. Yuba Power Products, Inc., 59 Cal.2d 57, 27 Cal.Rptr. 697, 377 P.2d 897 (1962). Producing cause was properly defined by the trial court as "an efficient, *exciting or*

*contributing cause,* which, in a natural and continuous sequence, *caused in whole or in part* the occurrence or injuries, if any, in question, and but for said cause the occurrence or injuries would not have occurred. There can be more than one producing cause." (Emphasis added). This definition applied to all producing cause inquiries.

In this situation, by such inquiries and answers Ford and Russell & Smith would ordinarily have become liable to LaRocca under the doctrine of strict tort liability. Ford, however, was not sued by LaRocca. While contributory negligence is not ordinarily a defense in this situation, if the user or consumer discovers the defect and is aware of the danger, and nevertheless unreasonably proceeds to make use of the product and is injured by it, he is barred from recovery. Shamrock Fuel & Oil Sales Co. v. Tunks, 416 S.W.2d 779, 784 (Tex.Sup.1967). A manufacturer or a retailer who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to such ultimate user or consumer if it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold. The Section is for the benefit of users and consumers and it applies although the seller, including manufacturers, has exercised all possible care in the preparation and sale of his products. Sec. 402A, American Law Institute, Restatement of Torts (2d Ed.); McKisson v. Sales Affiliates, Inc., 416 S. W.2d 787 (Tex.Sup.1967); Pittsburg Coca-Cola Bottling Works v. Ponder, 443 S.W.2d 546, 548 (Tex.Sup.1969). A product is not in a defective condition when it is safe for normal handling and consumption. Where, however, the seller has reason to anticipate that danger may result from a particular use, he may be required to give adequate warning of the danger, and a product sold under such circumstances without such warning is in a defective condition. See Sec. 402A, supra, note

"h". The jury found by special issue number 4 that such foreseeability and anticipation existed on the part of the manufacturer, Ford, so far as the installation of Climatic air conditioners on Econoline vehicles was concerned in July, 1965. The evidence supports issue number 4. Special issue number 15 inquires whether the installation of such air conditioner did not constitute a substantial change in the vehicle's design. The issue by reason of the definition of "substantial change" given in connection therewith, is very similar to the inquiry made in special issue number 4. However, under the circumstances of this case, we cannot say that such definition was defective or erroneous as a matter of law, and under the circumstances the evidence barely but sufficiently supports the issue. The jury's answer was that "It did not constitute a substantial change." See also Thomas v. General Motors Corporation, 13 Cal.App.3d 81, 91 Cal.Rptr. 301 (1970); Coca Cola Bottling Company of Houston v. Hobart, 423 S.W.2d 118, 123 (Tex.Civ.App.-Houston (14th Dist.) 1967, writ ref'd n. r. e.); 13 A.L.R.3d 1057, 1082, Products Liability—Strict Liability In Tort (1967).

However, the jury also found, under the trial court's definition of producing cause, that the cooling system of LaRocca's van was defective with the Climatic air conditioner on the vehicle, and that such defective condition was a producing cause of the occurrence (special issues numbers 3 and 5). While the jury found that Ford could have anticipated the installation and use of an air conditioner, the decision or choice of installing it was made solely by Russell, who had knowledge of the difficulties the units were causing and who had knowledge of the added defectiveness and danger caused by such air conditioner. The testimony is undisputed that use of a Climatic air conditioner on an Econoline van would put a severe strain on the engine and would greatly aggravate the condition already existing and cause the engine to run much hotter. It cannot be said

that special issues numbers 3 and 5 were merely cumulative or differing shades of special issues 1 and 2, since the jury found, and it is clear from all the evidence, that use of an air conditioner caused at least in part the injuries to LaRocca and was an exciting or contributing cause of the accident, as defined by the court.

Thus, we have at least two independent producing causes of the accident, one caused by Ford and the other caused by Russell, each under the theory of strict tort liability.

■ But it is contended that special issue number 11 concerning Ford's failure to warn Russell of the danger of installing such air conditioner on the 1965 Econoline as would have been given by a manufacturer using ordinary care, and the jury finding of proximate cause by special issue number 12, alters the rule as to indemnity sought by Russell against Ford. The danger was at least as fully known by Russell as by Ford. However, from the undisputed facts shown, the defects and dangers created by installation of Climatic air conditioners on the vehicle in question were fully known to Russell by William Frank Russell's own admission. Russell & Smith failed to warn LaRocca of the dangers and defects involved though the facts were at hand, and the dealer was negligent toward LaRocca. No jury finding is necessary to establish undisputed facts. Wright v. Vernon Compress Company, 156 Tex. 474, 296 S.W.2d 517, 523 (1956). In this indemnity action, the trial court should have disregarded special issue number 12 so far as it pertained to indemnity, proper objections having been made to the charge and brought forward on this appeal on grounds of no evidence to support the issues. Rule 301, T.R.C.P.

■ It is contended by appellee Russell that Ford is liable to it in any event since Sec. 402B, Restatement of Torts (2d Ed.), dealing with misrepresentations by a manufacturer or seller of chattels to consumers, permits recovery by a retailer as against

its manufacturer for indemnity, and that the jury by its findings on special issues 8, 9, and 10, summarized above, dealing with representation, reliance, and producing cause, results in liability of Ford in any event in this indemnity action. In the first place such Restatement section applies only to those who are engaged in the business of selling such chattels, and the section is for the benefit of users and consumers. Sec. 402B, note "e". In the second place, the evidence does not support such issues, especially issue number 9 dealing with reliance. The only testimony which might be termed a representation was as follows on question by Russell's own counsel:

"Q. When the '65 model came out and with the 240 engine in it, did anybody give you to understand that that would solve the problem with regard to the air conditioning in the Econoline?

"A. As I understand it through our factory representative, the 240 engine was to solve two problems. One, the underpower condition, the underpower condition that we had in the 170 and to give us a bigger engine to handle the air conditioner."

This conversation took place at a Dealer's Council meeting in the Fall of 1964, just before the introduction of the 1965 Econoline and the better part of a year before Russell had the Climatic unit attached to LaRocca's vehicle. The testimony shows that the 1965 models began selling in the Fall of 1964 with air conditioning installed. Soon the hoses began bursting and were returned for work and replacement, and overheating problems developed, which were known to Russell's service department. Russell admitted that the hoses were failing abnormally fast, and in early 1965 he was well aware of the overheating problems and equipment failures caused at least partly by Climatic air conditioners. The dealership continued to service LaRocca's van for over a year for this same problem, and the reason it did not replace or remove the air conditioner was because

of increased cost, at all times having independent knowledge of the defectiveness and possible dangers which existed. Ford made objections in this regard to the court's charge, by motion to disregard the finding under Rule 301, T.R.C.P., by motion for new trial, and by points of error on this appeal. Ford's objections to such above special issues, particularly issue number 9, should have been sustained on grounds of no evidence.

We believe that in this type of case the rules stated in Sec. 402A of the Restatement of the Law of Torts (2d Ed.) are not necessarily or at all times exclusively controlling in an action by an indemnitee against an indemnitor, i.e., Russell against Ford. As Professor Gus M. Hodges put it in his article on Contribution and Indemnity Among Tortfeasors, 26 Tex.L.Rev., pp. 150, 153 (1947), the problem involves "invariably a negligent or intentional wrong", and it is desirable to call it tort. "But this is a tort of the indemnitor against the indemnitee, *distinct and independent* from any tort committed by the indemnitor and indemnitee against the injured third party." (Emphasis added.) We further believe that none of the parties can gain any solace in the relatively early cases of Griggs Canning Co. v. Josey, 139 Tex. 623, 164 S. W.2d 835, 839–840 (1942) and Jacob E. Decker & Sons, Inc. v. Capps, 139 Tex. 609, 164 S.W.2d 828 (1942). In those cases it was assumed as established that the fault, it any, was on the manufacturer, and that the retailer acted as a mere innocent conduit, without culpability, knowledge or fault, for the distribution of the manufacturer's defective product. Certainly under those classic circumstances the liable but innocent retailer should be indemnified by the manufacturer of a product delivered in a sealed container when the defect in the product had to be caused by the manufacturer or processor, whether with or without fault. 26 Tex.L.Rev. 153, 154. And in the present case, we have a minimum of two separate acts which caused the injury, one by the manufacturer and one by the

retailer, an entirely different situation presented by Decker and Josey. Ford sold Russell a vehicle with a defectively designed cooling system, and Russell materially and knowingly aggravated and contributed to the condition by installing an air conditioner which severely enhanced the danger. Both operated concurrently to cause the accident. Texas law, despite the many problems involved between indemnitor and indemnitee, is well stated in the case of Austin Road Co. v. Pope, 147 Tex. 430, 216 S.W.2d 563, 564–566 (1949), where it was said that the rule rests on considerations of public policy, it being against the policy of the law to adjust equities between wrongdoers, or to allow a person to found an action on his own wrong. That case stated that the rule does not apply where the joint tortfeasors are not in pari delicto as to each other, as where the injury resulted from a violation of the duty one owes the other, "though both are liable to the injured third person, as between themselves the blameless should be allowed indemnity." It was further stated in that case that:

> "In order to determine whether the loss should be shifted from one tortfeasor to another the proper approach is to consider the one seeking indemnity as though he were a plaintiff suing the other in tort, and then determine whether such a one as plaintiff, though guilty of a wrong against a third person, is nevertheless entitled to recover against his co-tortfeasor."

The same case above further holds that where the negligence of two or more persons concur in producing a single indivisible injury, then such persons are jointly and severally liable, although there was no common duty, common design, or concerted action. See also Strakos v. Gehring, 360 S.W.2d 787, 796 et seq. (Tex.Sup.1962); Gulf, Colorado & Santa Fe Railway Co. v. Bliss, 368 S.W.2d 594, 596 et seq. (Tex. Sup.1963), the latter case rejecting under the facts a foreseeability test; South Austin Drive-In Theatre v. Thomison, 421 S. W.2d 933, 946–949 (Tex.Civ.App.–Austin 1967, writ ref'd n.r.e.); Borg Warner Corporation v. White Motor Company, 344 F. 2d 412 (5th Cir. 1965).

It was said in the case of Morgan Warehouse & Commercial Co. v. Gilbert Mfg. Co., 60 S.W.2d 1053, 1054–1055 (Tex.Civ. App.-Dallas 1933, writ ref'd) that:

> "Appellant's allegations to the effect that it knew, prior to the injury, that the elevator doors would not work automatically, was dangerous to the occupants of the warehouse and users of the elevators, and a constant menace to its tenants, and thus permitting the doors to remain and the elevators to be used, it thereby became the prime obligor for the damages sustained by the third party for its own alleged negligence. The exposure of such dangers, under such circumstances, to the users of the elevators, is the proximate cause of the alleged injuries to Servello.

> "If appellant suffered for its own wrongdoing, the law will not relieve it, for it cannot recognize a right as springing from a wrong in favor of one concerned in its commission. Appellant was put to an election of either making repairs and recovering over against the . . . . indemnitors, for the necessary and reasonable expenses incident thereto, or using the doors, thereby exposing the dangers to innocent third parties, assuming the duties and responsibilities and suffer the consequences that naturally and proximately flow from the negligence of an active wrongdoer. The one creating the condition, in consequence of which injuries resulted to the third party, under circumstances that active negligence may be determined, and the other owing a duty to such third party, employ the dangerous instrumentalities thus created with actual knowledge of its imperfection; each become active tort-feasors, and, as between themselves, there can be no contribution or indemnity. 'No one can make his own miscon-

duct the ground for an action in his own favor.' Thus the negligence of appellant, which was the foundation for the judgment, was active—in that, with full knowledge of the condition, appellant exposed the injured party to the created danger."

And returning to the language of Austin Road Co. v. Pope, supra, 216 S.W.2d at pp. 565–566, it was said:

"The evidence and jury findings herein clearly convict each of the tort-feasors of wrongful conduct which joined and concurred in bringing about the injury. Each party did more than merely create a condition under which the other negligently acted. The negligent conduct of each was a proximate cause of the collision and the injury inflicted was by their joint and concerted action. The act of neither was the sole proximate cause. Both tortfeasors were present on the scene, either in person or by representatives, and each participated in the wrong. Either one or both might have prevented the wrong. Neither did. Each owed the other the same due care, and each owed the duty to exercise ordinary care for the safety of the injured party. Both violated these duties. Consequently, each was guilty of the same quality of negligence toward the injured workman. Thus they stand in pari delicto with each other and must, under the statute, share equally the burdens arising from their wrongful conduct."

We think the above is substantially what we have in this case—fault produced by Ford and fault produced independently by Russell & Smith, and both concurred to cause LaRocca's injuries. The dangers had been well known to Russell & Smith since the Fall of 1964. The danger had been discovered by Russell & Smith, and the dealer exposed LaRocca to the danger in increasing force. See 26 Tex.L.Rev. 156.

■ Concerning special issues numbers 6 and 7 regarding the location of the en-

gine access cover inside the Econoline which was held to be a producing cause of the accident, we have pointed out above that at least two separate acts were found to have caused the injury to LaRocca, one by Ford and one by Russell. Russell & Smith failed properly and timely to warn LaRocca and such failure was a proximate cause of LaRocca's injuries based upon admissions and the uncontradicted evidence. A tort generally embraces the theory of wrong independent of contract, or as a breach of duty that the law, as distinguished from contract, has imposed. See 55 Tex.Jur.2d Torts, Sec. 1, p. 624 (1964).

In Wheeler v. Glazer, 137 Tex. 341, 153 S.W.2d 449, 451 (1941) it was said by Chief Justice Alexander:

"While the law does not seem to take note of the quantity of the negligence (fault) of the different joint tort-feasors as a reason for authorizing the one least negligent to have contribution from the other, the authorities do recognize a distinction in the quality of their negligence (fault)." (Parentheses added)

■ We have found that fault existed on both Russell & Smith and Ford and that neither is toward any party or in any respect blameless. Art. 2212, Vernon's Ann.Tex.Civ.St. allows contribution in any situation where there are multiple tort-feasors and none is entitled to indemnity. In its action against Ford, Russell & Smith prayed for full indemnity or in the alternative, contribution from Ford, and we believe the matter of contribution is properly before us.

We therefore hold that contribution under the statute is proper under the circumstances, and we consequently reform the judgment of the trial court and hold Ford liable to Russell & Smith for one-half the amount of the judgment. See Gulf, Colorado & Santa Fe Railway Co. v. Bliss, supra; Austin Road Co. v. Pope, supra; Hodges, Contribution and Indemnity, 26 Tex.L.Rev. 173. The evidence and jury findings herein clearly convict each of the

**562**

tortfeasors of wrongful conduct which joined and concurred in the bringing about of LaRocca's injuries.

We have considered each contention made by the parties hereto, and we are of the opinion that the appeal in the action by plaintiff, LaRocca, against Russell & Smith should be dismissed, and that the indemnity judgment rendered in favor of Russell & Smith against Ford be reformed as stated above. All costs herein expended are taxed against Russell & Smith.

The judgment of the trial court is reformed, and as reformed it is affirmed.

## ON MOTIONS FOR REHEARING

Ford Motor Company, appellant, and Russell & Smith Ford Company, appellee, have each filed motions for rehearing in this cause. As a result thereof we have again reviewed the record.

Relative to Russell & Smith's motion, we stated in the original opinion that "Russell & Smith failed to warn LaRocca of the dangers and defects involved though the facts were at hand, and the dealer was negligent toward LaRocca." Later in the original opinion we stated that "Russell & Smith failed properly and timely to warn LaRocca and such failure was a proximate cause of LaRocca's injuries based upon admissions and the uncontradicted evidence." By assignments of error numbers 7–18 Russell & Smith has challenged such statements above as being error, and after further consideration we agree.

■ While Russell admitted that no warning of the dangers and defects to his knowledge was given to LaRocca at the time of or subsequent to the sale of the Econoline van, and LaRocca testified that no warning was given, we do not believe that we can correctly say that such failure was a proximate cause of the resulting injuries to LaRocca as a matter of law under all the circumstances.

■ Contributory negligence must be pleaded by the defendant in this indemnity action if it is relied upon. On reconsideration, we find no such pleadings. Rule 94, T.R.C.P.; 2 McDonald, Texas Civil Practice, Sec. 7.36.2, p. 256 (1970 Rev.Vol.). Appellee was given no notice that the above matter would be relied upon by Ford, and no special issues were submitted thereon. While there is respectable authority holding that in an action for personal injuries allegedly caused by the negligence of a defendant (cross-defendant here) where plaintiff's (Russell & Smith's) own case necessarily puts in issue all the facts relied upon by defendant to show plaintiff's contributory negligence, and the burden of proof is on the plaintiff to acquit himself of fault, and in such case no plea of contributory negligence is necessary on the part of a defendant [See Murray v. Gulf, C. & S. F. Ry. Co., 73 Tex. 2, 11 S.W. 125 (1889); T. & P. R. W. Co. v. Murphy, 46 Tex. 356, 363 (Tex.Sup.1876, per Roberts, C. J.); 2 McDonald, Texas Civil Practice, Sec. 7.36.1 (1970 Rev.Vol.); and other authorities applying the rule], we hold that such rule is not here applicable when such evidence is not wholly undisputed and admitted or proven by Russell & Smith, cross-plaintiff. Russell & Smith's assignments of error above are sustained so far as they pertain to the matters in the opinion which are herein discussed. We withdraw our statements and holding as mentioned above, but we adhere to our original opinion in all other respects.

We reaffirm our views and our holding that since no optional equipment such as air conditioning was ever authorized for the Econoline commercial van, Russell & Smith installed or had installed the air conditioner on LaRocca's van strictly on its own volition and on its own responsibility, without any authority whatsoever from Ford Motor Company, and that Russell & Smith, as a matter of law, had sufficient knowledge of the facts and the consequences thereof at the time of installation to become a tortfeasor who breached a duty, or a duty to exercise ordinary care, to Ford as Ford's authorized dealer. Also,

under the supported fact findings, Ford breached a duty to Russell & Smith. And as we have stated, the acts concurred to cause LaRocca's injuries.

The matter of warning and proximate cause discussed above being unnecessary to our decision in this case, all motions for rehearing are respectfully overruled.