**INTERNATIONAL HARVESTER COMPANY, Appellant,**

v.

**Pedro ZAVALA and Fisher Controls Company, Appellees.**

**No. 17784.**

Court of Civil Appeals of Texas, Houston (1st Dist.).

July 23, 1981.

Rehearing Denied Sept. 17, 1981.

Vinson & Elkins, B. Jeff Craine, Dan S. Boyd, Houston, for appellant.

Fisher, Roch & Gallagher, Wayne Fisher, Sewell & Riggs, Walter T. Weathers, Jr., Houston, for appellee.

Before COLEMAN, C. J., and PEDEN and SMITH, JJ.

PEDEN, Justice.

International Harvester Company appeals from a judgment based on jury findings awarding Mr. Pedro Zavala damages of $605,000 in his strict liability suit for personal injuries sustained when liquified petroleum gases escaped through a pressure relief valve on the fuel tank of an International tractor and burst into flames. International was awarded contribution of one half of the $605,000 on its cross-action against the manufacturer of the defective pressure relief valve. Monsanto Company and its subsidiary, Fisher Controls Company (collectively, "Fisher" or "Fisher Controls").

The accident occurred in 1974 near Seguin, Texas. The 1953 model International tractor was owned by Zavala's employer, Mr. George Englar. Its tank, designed to use liquified petroleum gas and to accommodate high pressures, was fitted with an elbow-shaped protrusion with an opening for a pressure-relief valve. The Rego brand valve that was in use at the time of the accident had lodged inside it a screw that was found by the jury to have come from a Fisher valve that had been replaced a short time earlier.

The loose screw from the Fisher valve had apparently rested in the elbow-shaped tube coming from the fuel tank and, when the gas pressure caused the Rego valve to operate, or pop off, the screw was swept into the Rego valve, where it kept the valve from closing. The propane gas contents of the LPG tank were suddenly and totally emptied around Zavala in a field of tall, thick cane, were ignited by some source, and caused the injuries complained of.

The trial jury found, in response to special issues:

1. The location of the pressure relief valve on the tractor made the tractor defective
2. and this was a producing cause of the occurrence.
3. The tractor was made defective by the color of its tank,
4. and this was a producing cause of the occurrence.

5. The tractor was made defective by the absence of insulation between the tractor tank and engine,

6. and this was a producing cause of the occurrence.

7. The screw found in the Rego valve came from the Fisher valve.

8. The Fisher valve was defective when it left the control of Fisher Controls Co.

9. and such defect was a producing cause of the occurrence.

10. The damages findings were:
$100,000 for past physical pain
75,000 for future pain
100,000 for past mental anguish
50,000 for future mental anguish
50,000 for past physical impairment
80,000 for future physical impairment
75,000 for present disfigurement
75,000 for future disfigurement

International does not attack the evidentiary basis of the jury's answers to Special Issues 1, 3, and 5.

International contends that the trial court erred 1) in failing to grant it full indemnity against Fisher Controls, in overruling its motion for new trial, because the evidence of producing cause was legally or factually insufficient 3) in overruling an objection to an improper jury argument, and 4) in refusing to order remittitur of a portion of the damages found by the jury. We affirm.

In its first point of error International contends that it is entitled to full indemnity from Fisher Controls because 1) International's position is sufficiently analogous to that of a retailer or assembler of a defective part to bring it within the rule of *Heil Company v. Grant*, 534 S.W.2d 916 (Tex.Civ. App.1976, writ ref'd n. r. e.), and 2) if there were defects in the design of its tractor and if those defects operated as a producing cause of the accident, their operation occurred in an ultra-hazardous environment created by Fisher Controls.

The appellees say there are at least four reasons why International cannot obtain full indemnity from Fisher Controls in this case: 1) Fisher breached no duty to International because International was not a consumer or user of the pressure valve within the meaning of the *Restatement (Second) of Torts* § 402A (1965), 2) International sustained only economic loss, not physical harm, 3) International was not an "innocent" retailer or assembler, and 4) International is liable to Zavala on three grounds wholly independent of the valve defect attributable to Fisher.

■ Indemnity is "the payment of all of plaintiff's damage by one tortfeasor to another tortfeasor who has paid it to the plaintiff." *General Motors Corp. v. Simmons*, 558 S.W.2d 855, 859–60 (Tex.1977); Hodges, *Contribution and Indemnity Among Tortfeasors*, 26 Tex.L.Rev. 150, 151 (1947), and results in shifting the entire burden of loss from one tortfeasor to another. Contribution, on the other hand, is "the payment by each tortfeasor of his proportionate share of the plaintiff's damages to any other tortfeasor who has paid more than his proportionate part." *General Motors Corp. v. Simmons, supra*, citing Hodges, *supra*.

The apportionment of damages among strictly liable tortfeasors is governed by Article 2212, the original Texas contribution statute, and the principles enunciated in *Palestine Contractors, Inc. v. Perkins*, 386 S.W.2d 764 (Tex.1964). *General Motors Corp. v. Simmons, supra*, at 862. Unlike the latter case, this appeal does not present the problem of comparing percentage causation of a strictly liable manufacturer with a negligent co-defendant; here, both International and Fisher Controls were found strictly liable.

■ The Texas Supreme Court has held that the common law right of indemnity is no longer available among joint tortfeasors in negligence cases but has expressed no opinion as to whether such holding extends to strict liability cases. *B & B Auto Supply, Sand Pit, and Trucking Co. v. Central Freight Lines, Inc.*, 603 S.W.2d 814, 817 (Tex.1980).

The applicable rule was stated succinctly by the Corpus Christi Court of Civil Appeals in *Bell Helicopter Co. v. Bradshaw*, 594 S.W.2d 519, 535 (Tex.Civ.App.1979, no writ): "A party who is strictly liable to an injured party is required to indemnify a co-tortfeasor only when the co-tortfeasor has been injured due to a breach of duty owed him by a party strictly liable." *citing General Motors Corp. v. Simmons, supra*, at 859–60.

In determining whether Fisher Controls breached a duty to International in this case, we view International as the plaintiff and Fisher Controls as the defendant in an imaginary lawsuit, as suggested in *Austin Road Co. v. Pope*, 147 Tex. 430, 216 S.W.2d 563 (1949). In such a suit International would have to allege that it was injured by the defective Fisher valve; it would be attempting to establish Fisher's strict liability under Section 402a of the *Restatement (Second) of Torts*. The Texas Supreme Court made it clear in *General Motors Corp. v. Simmons, supra*, at 860, that the manufacturer's strict non-privity liability already had been pressed "to the outer limits of Section 402a" by holding that such a manufacturer has a duty under that section to the user, to the consumer or his property, and to a bystander suffering physical injury from his product.

The International tractor in our case was built nineteen years before the Fisher valve found defective by the jury. Mr. Englar purchased that Fisher valve several years after the tractor left International's possession and he installed it himself. Clearly, International neither used nor consumed the Fisher valve; Englar owned the tractor and bought the Fisher valve he installed. International could not recover as a plaintiff in a suit under § 402a against Fisher Controls because it was neither a user, consumer, assembler, nor a retailer and hence was not a proper strict liability plaintiff.

We do not agree with International's argument that its position is sufficiently analogous to that of a retailer or assembler to bring it within the rule of *Heil Co. v. Grant,*

*supra*, as reviewed in *General Motors v. Simmons, supra*, at 860–861. In the *Heil* case, the plaintiff's decedent was killed while repairing a truck owned by his brother, Vernon Grant. Vernon, the owner, user, and consumer of the truck, was held by the Court of Civil Appeals to be entitled to indemnity from the manufacturer of the truck, Heil, even if he was negligent in allowing the decedent to work beneath the truck bed. The Supreme Court noted in *General Motors Corp. v. Simmons, supra*, at 861, that although the point was not raised in the application for writ of error, the indemnity question was correctly decided in the *Heil* case, assuming that Vernon Grant did not know of the defect in the truck's bed. In our case there is no breach of duty by Fisher Controls to International, International is not a proper strict liability plaintiff and the facts are distinguishable from those in *Heil Co. v. Grant.* No express contractual duty existed between International and Fisher Controls, and International's liability was not predicated on the defect found by the jury to exist in the Fisher valve.

There is another reason why International must be denied full indemnity against Fisher Controls. In a hypothetical lawsuit between International and Fisher, the plaintiff would have the burden of proving physical harm, not mere economic loss, before recovery would lie under Section 402a. *Lubbock Manufacturing Co. v. Sames*, 598 S.W.2d 234, 236 (Tex.1980); *Nobility Homes of Texas, Inc. v. Shivers*, 557 S.W.2d 77 (Tex.1977). In *General Motors Corp. v. Simmons, supra*, at 860, the Texas Supreme Court wrote:

Section 402a and our decisions, however, have limited tl.e seller's liability to the terms of the Restatement Rule which is "for physical harm thereby caused ...." Feld and Johnson make no claim that they suffered physical harm. To extend the duty to include *liability* to others would mean that in all cases the seller or manufacturer is subjected to indemnity without regard to the independent torts of others. (emphasis in original)

Clearly, International has suffered only economic loss as a result of this accident and could not succeed in establishing liability against Fisher for this reason. *See, also, United Tractor, Inc. v. Chrysler Corp.*, 563 S.W.2d 850, 851 (Tex.Civ.App.1978, no writ).

Finally, International urges that it is entitled to full indemnity because its tractor was operating in an environment made ultra-hazardous by the defective Fisher valve. The assumptions made by International as to the facts here involved do not support its position which is that absent the Fisher valve defect, which allowed all the propane vapor to escape from the tank and collect around the tractor, the defects found by the jury would not have resulted in injury to Zavala. As will be seen in the discussion of causation that follows, the appellant's theory evidently was rejected by the jury.

We consider the facts of this case to be more similar to those found in *Ford Motor Co. v. Russell & Smith Ford Co.*, 474 S.W.2d 549 (Tex.Civ.App.1971, no writ), than to the cases cited by the appellant. In that case the Fourteenth Court of Civil Appeals held that the retailer was not entitled to indemnity where its installation of a defectively designed air conditioning system aggravated the problem caused by the cooling system's defective design. Holding that contribution was appropriate where two independent faults concurred to cause the plaintiff's injuries, the court reasoned that the classic "retailer as an innocent conduit" analogy did not apply.

We overrule the appellant's first point of error.

International next complains that the trial court erred in overruling its motion for new trial because there was no evidence of causation to support the submission of special issues 2, 4, and 6 and the evidence of causation was factually insufficient to support the jury's answers that each of the three defects in the International tractor (found in response to issues 1, 3, and 5) was a producing cause of the occurrence in question. The trial court instructed the jury that "'producing cause,' as used in this charge, means an efficient, exciting or contributing cause, which in a natural sequence produced injuries or damages complained of, if any. There can be more than one producing cause."

The appellant's evidentiary complaints rest on the theory that the accident occurred because the valve malfunction allowed all of the propane from the tractor tank to escape, that the propane, being heavier than air, accumulated on the ground around Zavala and the tractor, did not disburse because of the surrounding thick cane field, and was ignited by an unknown source. While this view of the events was supported by the testimony of the appellant's expert witness, Professor Mayeux, the jury was entitled to accept the account of Zavala, the only eyewitness to the accident, who testified that the escaping gases caught fire "right away," immediately after he heard the hissing noise, put the clutch in, and changed the gear. He thinks it was less than five or ten seconds. The appellant was unable to show conclusively that the fire would not have occurred if the relief valve had functioned properly or that to find otherwise was against the great weight of the evidence. We will notice some of the other evidence supporting the jury findings as to producing causes.

Dr. Gary Scott Nelson stated that even with a properly operating valve the amount of vapor or fuel which would escape from the tank when the valve relieves could ignite in the field and that a significant hazard was created whenever vapor is expelled at high pressure, whether the pressure relief valve was stuck or not.

Dr. Nelson expressed the opinion that if the safety release valve had been located on top of the fuel tank and if the gasses vented from it had been unobstructed, rather than dispersed toward sources of ignition and the area of the operator of the tractor, the result might have been like a severe sun burn, but the serious injury would not have occurred—whether or not the valve was defective and stayed open.

Dr. Nelson testified that when the relief valve is operating properly, two or three

cubic feet of vapor will be emitted at 250 pounds per square inch, and they will expand to the atmospheric pressure of 14 p.s.i. He said that is quite a quantity of gas and, once ignited, the flame's temperature is 3700 degrees, and that's hotter than molten steel.

Mr. Sumner of Fisher Controls said that it was his opinion, based on tests he had conducted and on his experience, education, and knowledge, that a normally functioning pressure relief valve on an International tractor such as the one Zavala was driving at the time of his injuries could expel vapor and be involved in a fire which will burn the driver. Photographs demonstrating Mr. Sumner's tests were admitted in evidence and considered by the jury. The following colloquy with Sumner also was had:

"Q. All right, sir. If you had a Super M 1953 Farmall tractor equipped an LP tank like this and like the ones we have seen pictures of, with a pressure relief valve on it, either a Rego or a Fisher valve, set to relieve at two hundred and fifty pounds per square inch, and you have a steering column over that and a throttle arm and the throttle mechanism up here that we have all seen pictures of, and that tractor was caused to relieve pressure, from whatever source, when the pressure in the tank got high enough where the valve has to relieve the force, do you believe that a fire could ensue without any malfunction of the valve on the tractor.

A. Yes.

Q. And where, if a fire ensued, where would the flames be?

. . . . .

A. (Continuing) Generally, when the valve is relieving and the gas is escaping and the gas becomes ignited, the flames will begin at about this level (indicating), at about where the steering column and throttle rod begin."

There also was conflicting expert testimony as to what constitutes proper operation of a pressure relief valve. The appellant's experts indicated that a single high pressure blast of vapor occurs during proper operation, but the appellees' experts testified that the operation varies among different valves and that even the same valve may release pressure either suddenly or gradually in different circumstances. Zavala's testimony as to the short interval between the time he heard the sound like air escaping and the flash of fire is not compatible with the appellant's theory that all of the vapor escaped from the tank, accumulated on the ground, and then was ignited.

■ The appellant's expert admitted that painting the tractor's fuel tank red increased the solar heat absorption rate in the tank by 20 degrees and that painting it silver or white would have eliminated a substantial portion of the solar heat build-up. The accident happened on a hot summer day. Most propane tanks are painted silver or white because those colors reflect heat, as opposed to red, which retains heat. The screw missing from the Fisher valve never could have "popped off" into the open Rego valve without the initial release of vapor caused by the heat build-up. We hold that the foregoing evidence is sufficient to support the submission of special issue number 4 and the jury's answer that the color of the tank was a producing cause of the accident. We overrule points of error three and six.

The appellant's second and fifth points of error attack the findings that the location of the pressure relief valve on the International tractor was a producing cause of the accident. The valve was located at approximately the center rear of the fuel tank. When the tank is full, an air space remains at the top to allow for thermal expansion of the fuel. It was necessary, therefore, for the pressure relief valve (or a tube leading to it) to feed into the vapor space at the top of the tank, rather than into the liquid fuel, in order for the valve to vent the excess pressure created by the thermally expanding vapors, and the International tractor here involved had such a tube running from the valve to the air space. The screw found by the jury to have been dislodged from the Fisher valve lodged somewhere in that tube

and subsequently was forced by vapor pressure into the Rego valve, preventing it from closing. There was expert testimony that if International had designed the tractor so that the valve fed directly into the air or vapor space at the top of the tank, no tube would have been required, and in the absence of the connecting tube, any loose screw from the Fisher valve would have fallen directly to the bottom of the tank and could not have become stuck in the Rego valve. There also was testimony that the location of the valve's exit port in close proximity to the steering rod, throttle, and the throttle arm created a vapor blocking effect, resulting in the dispersion of vapor. The desirable design is to have an unobstructed vertical venting directed away from the machinery and the tractor operator, but on the tractor in our case the location of the steering and throttle linkage rods caused vapor flow to be directed toward the operator and the sources of ignition.

Professor Mayeux, one of International's experts, agreed that such blockage would deflect vapors exiting from the pressure relief valve and said that he had not examined a similar model International tractor. He estimated that vapor would begin escaping from the valve at a 1½ inch width, had measured the steering rod width as being ⅞ inch, and estimated a ½ inch width for the throttle linkage. He acknowledged that a steering rod design which inclined upward toward the driver, as in the tractor Zavala was driving, would prevent the existing vapors from dissipating directly into the atmosphere. The photographs in evidence show that the valve was located not more than three feet from the tractor operator.

Dr. Nelson, Zavala's expert, said the venting location was such that the operator would be virtually surrounded by the escaping propane vapor.

Dr. Nelson also testified, in response to these questions:

Q. Okay. Let me ask it another way: If the pressure relief device were located up here on the top or over here on the side (indicating) or just over a little bit and vented clearly, okay, where there were no obstructions, and if that pressure relief device were to not work right, has something like a foreign screw, something like that, so once it is opened does not close, but keeps on spewing, if it were in a place where it could vent unobstructed, would you expect there to be a fire?

A. Well, the chances are greatly reduced. However, if it was vented either on the top of even where it is with some slight modifications and it did catch fire, I would be relatively unconcerned as far as damage to equipment or personnel. In some cases, it is actually desirable that it does ignite, as long as it is vented away from property and personnel.

. . . . .

Q. Do you have an opinion, Dr. Nelson, based upon your training and experience, based upon the job that you have done, things you have learned through that, whether or not if the—if the safety relief device had been located on the top unobstructed rather than on the back of the tank such as it was, do you have an opinion whether or not, *even though the valve itself might have malfunctioned to the point of staying open*, whether or not Pedro Zavala would have been involved in a fire such as we all know that he was?

A. I think it would have been a difference.

Q. Would you explain to the jury and tell them why it may have made a difference?

A. Well, it would be the result of several factors. One, the venting of the vapors would have been straight up in the atmosphere, it would not have been dispersed around the area of the operator. *Regardless of whether the valve stayed open, whether the valve was defective or whether it caught fire or not*, it would have been a matter of wasting fuel and scaring the operator pretty badly. But that would probably be the worst result.

. . . . .

Q. Okay, So you think a better design would be to put this valve right up on top of that tank. Is that right?

A. Yes, sir. This would allow the vapor to release unobstructively to the atmosphere. And if it should become ignited, it would not necessarily be a problem, *even if the valve failed in that position*, it may not be a problem to the operator or anyone else, or the eqipment. (emphasis added throughout)

■ Testimony by the appellant's experts that neither the valve's location nor the "blockage effect" had anything to do with the accident did no more than raise a fact issue as to the causal connection between those factors and the fire. As to the unchallenged defective location of the valve on the International tractor, we hold that the evidence of producing cause is both legally and factually sufficient, and we overrule points of error two and five.

■ The appellant's fourth and seventh points assert that there was insufficient evidence or no evidence that the lack of a heat shield between the fuel tank of the tractor and its engine was a producing cause of the accident. We disagree. It was undisputed that operating the tractor's engine created heat which was transferred to the fuel tank, and it is heat which increases the vapor pressure inside the tank and makes a pressure relief valve necessary. The tractor in question had no shield, asbestos, or insulation to prevent heat transfer from the operating engine to the fuel tank. Professor Mayeux testified that a fire wall could have been installed to prevent or diminish the amount of heat thus transferred.

We hold that a fact issue was raised as to whether an unreasonably dangerous defect caused by the absence of insulation was a producing cause of the accident. We overrule points four and seven.

The appellant's eighth point of error is:

The trial court erred in overruling the motion for new trial of International Harvester Company because the following jury argument of counsel for Zavala was improper and prejudicial and probably caused the rendition of an improper judgment:

Think for a minute, ladies and gentlemen, think about how the law looks at such things as pain.

A criminal can be the most horrendous individual that we could ever encounter and the law says ... [objection, argument, and ruling omitted] you can take a man's life, but you cannot inflict pain on him. The worst hardened criminal under the law cannot have pain inflicted upon him.

And the trial court erred in overruling the objection of International Harvester Company to this argument because such argument was improper and prejudicial and probably resulted in the rendition of an improper judgment.

■ The entire colloquy from which the excerpt was taken was as follows:

Mr. Young: Think for a minute, ladies and gentlemen, think about how the law looks at such things as pain.

A criminal can be the most horrendous individual that we could ever encounter and the law says, if he is—you can take his life—

Mr. Crane: If the Court please, we object to this. Nobody has caused anybody any pain intentionally and it has no place in this lawsuit.

Mr. Young: Your Honor, I am certainly not arguing that they were criminals.

Mr. Crane: We didn't cause it, nobody here has ever been accused of doing pain intentionally. We object to it.

Mr. Young: I am not arguing that they caused him pain intentionally.

The Court: All right.

Mr. Young: I use this—

The Court: I will sustain the objection. Let's go ahead.

Mr. Young: The law says that if a person causes pain intentionally, you can put them to death, but—

Mr. Crane: If it please the Court, please, we object. This has to do so with some sort of criminal proceedings and is not related to this lawsuit.

The Court: I am going to overrule that objection. Let's move on.

Mr. Young: Ladies and gentlemen: It disturbs me so much, but let me make my point, that the law says you can take a man's life, but you cannot inflict pain on him. The worst hardened criminal under the law cannot have pain inflicted on him.

We cannot say the argument was proper, but we hold that it was not so harmful as to require reversal.

▇▇▇ Following the court's sustaining the initial objection the appellant did not request a mistrial or ask that the jury be instructed to disregard the remarks. Any error resulting from improper jury argument is waived where the appellant fails to move the court to instruct the jury to disregard, following a favorable ruling on his objections. *Otis Elevator Co. v. Wood*, 436 S.W.2d 324 (Tex.1968); *Johnson Testers v. Rangel*, 435 S.W.2d 927 (Tex.Civ.App. 1968, writ ref'd n.r.e.) The appellant argues, however, that his second objection was overruled. The second objection was that the argument related to a criminal proceeding rather than to a civil case, and the appellant's counsel did not argue, as it now does, that the argument misstated the law or was highly prejudicial. Finally, even if the argument was improper and the error was not waived, it still must be shown that it was so harmful and prejudicial as to have resulted in the rendition of an improper verdict. *Aultman v. Dallas Railway and Terminal Co.*, 152 Tex. 509, 260 S.W.2d 596 (1953); Rule 434, Tex.R.Civ.P. We do not consider that the argument complained of constituted a significant part of a statement of facts which includes more than 1700 pages; the jury heard two weeks of testimony and reviewed the graphic color pictures of the plaintiff's burn injuries, which also are a part of this record.

Finally, International contends that the amount of damages found by the jury is excessive and that the trial court erred in not ordering a remittitur of a portion of that sum.

In response to special issue 10 the jury *found* as damages a total of $605,000, the sum awarded to Zavala in the judgment.

The appellant argues that it was error for the trial court to refuse its suggestion of remittitur in the amount of $480,000 because Zavala did not attempt to prove damages for past or future medical expenses, lost income, or lost earning capacity, because if the plaintiff had itemized the amounts prayed for in his amended original petition, it is likely that the $605,000 for damages items actually submitted to the jury would have been excessive by his own admission, and because it is doubtful whether Zavala intended even to pray for $605,-000 for the particular items of damages submitted. The appellant does not address the evidence supporting the jury's award.

▇▇▇ Chief Justice Coleman wrote for this court in *Donaghey v. Van Cleave*, 456 S.W.2d 524 (Tex.Civ.App. 1970, writ ref'd n. r. e.), that an appellate court should not substitute its verdict on damages for that of the jury unless the record indicates that the jury was influenced by passion, prejudice, improper motive, or something other than conscientious conviction. *Accord, Missouri Pacific Railroad Co. v. Miller*, 426 S.W.2d 569 (Tex.Civ.App. 1968, no writ). It is peculiarly within the function of the jury to determine the dollar value of the plaintiff's pain and suffering, *Bill Hendrix Auto Parts v. Blackburn*, 433 S.W.2d 237 (Tex. Civ.App. 1968, no writ), and both the jury and the appellate court are entitled to consider the effects of double digit inflation, *Caterpillar Tractor Co. v. Gonzales*, 599 S.W.2d 633 (Tex.Civ.App. 1980, writ ref'd n. r. e.); *Halliburton Co. v. Olivas*, 517 S.W.2d 349 (Tex.Civ.App. 1974, no writ). The mere fact that a verdict is large is no indication of passion, prejudice, sympathy, or other circumstances not in evidence. *Hammond v. Stricklen*, 498 S.W.2d 356 (Tex.Civ.App. 1973, writ ref'd n. r. e.).

At the time of the accident on July 29, 1974, Pedro Zavala was 59 years old; he had a life expectancy of 13.4 years at the time of trial. He has had only four years of formal education and began earning his living through farm work when he was fifteen years old. Before the accident he worked hard ten hours a day, six days a week, was

able to provide for himself and his family, and was able to perform all manner of farm work for his employer of fourteen years, as well as any necessary work and repairs around his own home. Following the accident Zavala was reduced to dependency on his wife and daughter, and his activities still were mainly confined to the home at the time of trial. He cannot button his own shirts without difficulty, cannot drive a car, cannot be out in the sun without protective clothing, and must wear cotton gloves on his hands continuously because they feel "frozen." A severely burned person, such as Mr. Zavala, is very limited in his activities and functions, because his skin burns easily and the scar tissue bruises easily.

George Englar, the plaintiff's former employer, saw the smoke from the tractor fire and arrived to find Zavala with practically all of his clothes burned off and his skin hanging down. Zavala said he heard a sound like air escaping, saw a light, then something red came against his face. He fell from the tractor and began pulling off his burning clothes as he crawled on his hands and knees; he was surprised and overwhelmed by fear. Englar drove Zavala to the Seguin hospital for treatment, and en route Zavala urged him to drive 80, 90, 100 m.p.h. because he hurt so badly. After five hours in the Seguin hospital, Zavala was transferred to the Brooke Army Hospital burn ward in San Antonio, where he was placed in the intensive care unit reserved for patients whose lives are in danger and was treated by Dr. Arthur Rosenthal.

Dr. Rosenthal testified that Zavala had suffered burns to his face, neck, arms, hands, and back, which encompassed 42% of his total body surface; 9% of his body surface had third degree burns, and the remainder had second degree burns. He was treated almost daily by debridement (removal) of the burned skin with scissors, forceps, pliers, and whirpool therapy. No anaesthetic can be administered during the debridement treatment, and during the first several days Zavala was given morphine every two hours for the pain. Upon completion of the debridement process Zavala underwent four skin graft operations during his initial 2½ month stay in the burn unit. He underwent a fifth operation in 1975 to remove webbing of the heavy scar tissue between fingers of his right hand, a sixth operation of similar nature to improve movement in his right arm, and a seventh operation to remove webbing on his left hand.

Eleven photographs of Zavala's injuries at the time he was admitted to the burn ward were introduced in evidence, as were all of the hospital records. In addition to his physical discomforts Zavala experienced depression, paranoia, disorientation, and nightmares to the extent that he was referred to a psychiatrist and had to have his hands and feet strapped down at night.

The plaintiff's attorney urged the jury to award Zavala $50 per day (past and future) damages for pain, mental anguish, physical impairment, and disfigurement, considered separately. The award of $605,000 is well supported by the evidence. Points of error nine through seventeen are overruled.

Affirmed.